[No. S022481. Apr. 28, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN ANTHONY NAVARETTE, Defendant and Appellant.

464

472

**COUNSEL**

Jeffrey L. Garland, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General,

John R. Gorey and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—Defendant Martin Anthony Navarette appeals from a judgment of death. A jury convicted defendant of the first degree murder (Pen. Code,[1] § 187, subd. (a)) (count 2), burglary (§§ 459, 460) (count 3), and robbery (§§ 211, 212.5, subd. (a)) (count 4) of a neighbor and the first degree murder (§ 187, subd. (a)) (count 5), burglary (§§ 459, 460) (count 6), and attempted robbery (§§ 211, 212.5, subd. (a), 664) (count 7) of a second neighbor. The jury found true allegations that defendant committed both murders with burglary-murder, robbery-murder, and multiple-murder special circumstances (§ 190.2, subd. (a)(3), (17)) and that defendant personally used a deadly or dangerous weapon within the meaning of section 12022, subdivision (b). As to a third victim, the jury acquitted defendant of attempted murder (§§ 187, subd. (a), 664) but convicted him of the lesser included offense of battery with serious bodily injury (§ 243, subd. (d)) (count 8) and also convicted him of second degree robbery (§§ 211, 212.5, subd. (a)) (count 9), finding great bodily injury (§ 12022.7) in connection with both these offenses. The jury acquitted defendant of a separate count of burglary (§§ 459, 460) (count 1).

At the penalty phase, the jury returned a verdict of death, and the trial court denied defendant's motion for a new trial or modification of the verdict. The court sentenced defendant to death as to counts 2 and 5, and stayed the one-year personal-use enhancements (§ 12022, subd. (b)). The court struck the great bodily injury enhancement (§ 12022.7) as to count 9. As to the other counts and related allegations, the court imposed a total determinate sentence of eight years and four months. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Guilt Phase Evidence*

Defendant began drinking beer during the morning of December 5, 1989, after his girlfriend and housemate, Maria Valles, left for work. Valles is the mother of defendant's two children. Defendant spent the day drinking beer with various companions. During the course of the day, defendant and a few others consumed two or more cases of beer, and defendant became intoxicated. Defendant also smoked cocaine.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant had no key to his ground floor apartment and regularly used a window to gain entry. His apartment was one of three, each with similar ground floor windows. Deborah Converse lived in apartment 3, Alexandra Hickman lived in apartment 4, and defendant lived with his family in apartment 5. About 5:00 p.m. on December 5, 1989, Deborah Converse discovered that her apartment had been burglarized. Her bedroom was ransacked, and a videocassette recorder was missing from the living room. Converse went to the house of a neighbor and called the police. The police found that the burglar had used a bedroom window to gain entry. Police also noted that certain valuables, including a 35-millimeter camera and three rifles, had *not* been stolen.

About 5:00 or 6:00 p.m., defendant had a beer with David Nichols and Shane Wilson. Defendant asked them if they knew where to sell a videocassette recorder and a clock radio/telephone. The same night, at 11:30 p.m., witnesses observed defendant at the apartment complex, wearing blue jeans and a white shirt with a Nike logo. A few hours later, about 1:30 a.m., defendant called his girlfriend Brigette Morales, a different woman from the woman he lived with. He asked Morales to go out with him in a truck he was driving (defendant did not own a truck), but Morales refused. Defendant also asked Morales to call someone on the telephone, which she did, but the person was not there.

The same night, about 3:30 or 4:00 a.m., neighbors awoke to the sound of breaking glass and a man's angry voice. Alexandra Hickman's upstairs neighbor heard what sounded like a struggle coming from the vicinity of Hickman's apartment, and he called police. He surmised from the noises that someone was trying to get out of, rather than in, Hickman's apartment. One neighbor observed defendant running away from the building, wearing blue jeans and a white shirt.

The police arrived shortly after 4:00 a.m. A window had been broken out of Hickman's apartment, with the screen and most of the glass lying outside, and the curtain also hanging outside. One officer peered into the apartment and saw a body lying in a pool of blood on the floor. Officers entered the locked apartment. Hickman's body was warm but without signs of life. She had suffered stab wounds from her head all the way to her legs, too many to count. The autopsy later found 43 stab wounds and five slice wounds. Police called paramedics and secured the crime scene. Water was running from the bathtub faucet, and officers turned it off. The bedroom also showed signs of a struggle, with blood on all the walls and a plant and other items overturned.

During the course of the morning, investigators discovered more evidence. A wooden-handled steak knife was on the floor under Hickman's body, the

handle broken off and the blade bent. Similar knives were in an open drawer in the kitchen. Police also found, near Hickman's body, a metal rivet-type button similar to the buttons used to close jeans at the waist. A few torn threads were attached to the button. Police found no signs of ransacking or theft in Hickman's apartment, and an autopsy later found no evidence of forced sexual assault.

Police took statements from Hickman's neighbors. No one responded at Deborah Converse's apartment, and her pickup truck was missing. Valles (defendant's girlfriend and housemate) responded at defendant's apartment, and police observed that she seemed nervous. Officers could not locate defendant. That afternoon, after several attempts to determine where Converse might be, police decided to enter her apartment. Officers slid open a window and saw a bloody body on the floor. After making friends with Converse's dog, they entered the apartment. Converse's hands and feet were bound with a dog leash, and she had suffered about 15 stab wounds to her chest and upper torso. She was naked from the waist down, with her pants and underwear around her ankles, though an autopsy found no other evidence of forced sexual assault. Officers observed signs of a struggle. In addition, a knife was missing from a wooden knife block next to the kitchen sink, and officers found the handset of a red portable telephone in the bathroom sink. The base of the same telephone was near the dining room table. Converse's family determined that certain items were missing, including Converse's pickup truck, her keys, two purses, and the 35-millimeter camera and rifles that had been in the apartment after the burglary the afternoon before.

Officers also observed and photographed several shoe prints in the mud near Hickman's and Converse's apartments. In addition, they found a clean knife on the roof of the carport. The autopsies indicated that this knife could have been the knife used to kill both Hickman and Converse. A neighbor also found a clock radio/telephone in the carport and reported this discovery to the police.

Meanwhile, about 6:50 a.m. on the morning after the murders, defendant got back in touch with his girlfriend Brigette Morales. He said the truck he was driving had broken down, and he convinced Morales to meet him at a nearby hamburger stand. When Morales arrived, she saw defendant come toward her car from across the street. He climbed into the backseat on the passenger side and wrapped himself in a blanket because he was cold. His shirt was on inside out and backwards, and Morales observed stains on his clothes. Defendant said the stains were paint. He pointed to a truck and identified it as his. Morales's recollection of the truck generally matched Converse's missing truck.

Morales went to buy some gas, and in the gas station, she observed that the stains on defendant's clothes were blood. Defendant said he had been in a fight and then signaled with his eyes that Morales should stop asking questions. He told her where to drive, and when they were in a residential neighborhood, he told her to stop. Then he said he wanted to tell her a secret. She put her seat back and turned to face him, and he struck her in the face hard enough to break her nose. Then he put the blanket over her face and held her down. She threw her keys outside the car, and when he asked for the keys, she managed to escape, fleeing to a nearby house. Defendant retrieved the keys and left with her car. A local resident helped Morales and also called the police. Morales's face was covered with blood, her nose was pushed to one side, and her lip was swollen. Her nose later required surgery.

About noon on the same day, while police were busy investigating Hickman's murder and searching for Converse, Benny Garcia, Valles's brother-in-law, saw defendant sitting on the stairs in front of Garcia's home. Defendant was wearing stained jeans but no shirt. (A shirt with a Nike logo and bloodstains later turned up at defendant's apartment.) Defendant told Garcia he had been in a fight. Garcia invited him inside, and defendant asked if he could wash his clothes. He put his jeans in the washroom and borrowed some clothes from Garcia. Garcia later took defendant to Matthew Lanterman's house. Valles and defendant both worked for Lanterman, Valles as a babysitter, and defendant as a painter's helper. When defendant arrived at Lanterman's house on the evening after the murders, Lanterman made him wait outside and refused to give defendant a ride.

Around 7:30 or 8:00 p.m., officers went to the house of defendant's mother and stepfather. Valles had directed them to that address. Officers arrested defendant at that location, without incident. Defendant had fresh scratches and minor cuts on his hands, arms, and neck. His shoes had the same sole design as the shoe prints discovered at the crime scene. In defendant's apartment, police found the two purses that were missing from Converse's apartment. Police also retrieved the jeans defendant had left at Garcia's home. The jeans were bloody, with the waist button missing. Laboratory testing confirmed that the threads of the jeans were the same material and color as the threads attached to the button that police had earlier found on the floor near Hickman's body, and the button was the type typically found on jeans from the same manufacturer.

Fingerprint experts found defendant's palm print in Hickman's apartment on the interior side of the broken glass that was on the floor. They found his palm or fingerprints in Converse's apartment on the windowsill, bedroom door, and the base of the red telephone. A prosecution expert also tested

several samples of blood from defendant's clothing and Converse's truck and then compared those samples to blood samples taken from defendant, Valles, Converse, Hickman, and Morales. The expert tested for certain forms of enzymes and proteins in the blood. This sort of testing can establish that a blood sample is of a type shared by a relatively small percentage of the general population.

Blood on defendant's clothing matched Hickman's blood and not that of defendant, Valles, Converse, or Morales. One of the bloodstains on the jeans was of a type shared by Hickman and only 0.08 percent of the population. Other blood on defendant's clothing matched Converse's blood and not that of defendant or Hickman. One bloodstain was of a type shared by Converse and only 0.7 percent of the population. Other blood on defendant's clothing matched defendant's own blood. Bloodstains in Converse's truck matched defendant's blood and not that of Converse or Hickman.

### B. *Penalty Phase Evidence*

The prosecution presented photographic evidence indicating the brutality of the murders and also evidence of a prior conviction of assault with intent to commit rape (§ 220).

The defense offered the testimony of Frances C. and others to explain the circumstances of the prior conviction. Defendant was visiting friends at their apartment, drinking alcohol and using PCP (phencyclidine). A window broke, and Francis C., the 74-year-old landlady, came to the apartment and spoke to defendant. Defendant told Frances C. that he wanted to work at the apartment complex as a gardener. Later, he went to Frances C.'s apartment to give her his name and telephone number. While there, defendant made an alcoholic drink for himself. He then dragged Frances C. into the bedroom and climbed on top of her. He said he wanted to have sex with her, hit her, tried to touch her breasts and genitals, and took off his own pants. Frances C. struggled with defendant and finally rolled him onto the floor where he passed out from drinking. A neighbor called the police, who had difficulty reviving defendant.

Defendant also presented evidence of his troubled upbringing in a broken home. During defendant's childhood, his mother was a heavy drinker and had a series of short-term sexual relationships with different men. Some of these men abused her. Defendant's mother testified that she conceived defendant during a short-term relationship with a man who later denied being defendant's father and would have nothing to do with defendant. Accordingly, defendant never met his father. Defendant was born with a

large tumor on the back of his head and remained in the hospital for 45 days after his birth, separated by glass from his mother. Though doctors removed the tumor surgically, defendant's mother believed the birth defect was a punishment from God, and she was not sure defendant would live. As defendant grew up, he became close to his grandmother, who called defendant's mother a whore in front of defendant. Eventually defendant's mother settled down with a man named Frank Gallegos, an alcoholic with a drug problem. Gallegos treated defendant badly, and defendant's mother rejected defendant in order to give her attention to Gallegos.

When defendant was growing up, his vocabulary was not as large as the other children his age, and he was a little "slower." He seemed unhappy, and his mother was not strict with him. When he was a teenager he started taking illegal drugs. He attempted more than once to quit drugs, but without success. As a young man, he worked in odd jobs to support himself and his family. He helped take care of Valles and their children, and Valles said she loved him, though he would sometimes leave for days at a time. He also did things to help his sister's children and stepchildren.

## II. DISCUSSION

### A. Pretrial Issues

1. *Trial Court Properly Denied Defendant's Motion for a Change of Venue.*

██ Defendant argues the trial court should have granted his pretrial motion for a change of venue to a different county or for transfer to a different judicial district within the County of Los Angeles, citing news coverage of the case. ██ A trial court should grant a motion for a change of venue when publicity has created a "reasonable likelihood" the defendant will not receive a fair trial in the county. (§ 1033, subd. (a).) The defendant, who has the burden of proof, need not prove that an unfair trial is more probable than a fair one, but he must prove more than a mere possibility of unfairness. (*People v. Jenkins* (2000) 22 Cal.4th 900, 943 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) In assessing the motion, the trial court considers the gravity and nature of the crime, the extent and nature of the publicity, the size of the community, and the status of the victim and the accused. (*Ibid.*) The same standards apply to a motion for an intracounty transfer. (*Id.* at p. 945.)

██ Here, defendant's moving papers merely cited four newspaper articles about the case and an unspecified television news report. This

limited evidence belies his characterization of the coverage as "extensive, multi-media . . . publicity" that "flooded the public." Concerning the television report, defendant presented no evidence other than his counsel's vague declaration that this report occurred. The four newspaper articles appeared in local newspapers 15 months prior to the court's ruling on the motion for a change of venue. Defendant did not present evidence that news coverage continued more than a few weeks after the crimes occurred, and the coverage at the time of the crimes was not particularly inflammatory. The articles merely related, without editorial comment, much the same information the evidence later established. This sort of publicity is typical of many murder cases and certainly not so pervasive and continuing as to arouse the emotions of the community against defendant or otherwise deprive him of a fair trial. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1275, fn. 16, 1277 [18 Cal.Rptr.2d 796, 850 P.2d 1] [no need to change venue despite 51 newspaper articles and 24 television reports].) In fact, of the factors relevant to a motion for a change of venue, only the gravity and nature of defendant's crimes weigh in favor of granting the motion, but this factor alone does not necessitate a change of venue. (*People v. Jenkins, supra*, 22 Cal.4th at p. 943.) Defendant argues that the victims' status as White women and his status as an Hispanic man tended to increase the community outrage against him, but the news coverage of the crimes did not mention race and only one article showed a picture of defendant. Defendant has not shown that racial issues undermined his ability to have a fair trial in Los Angeles County.

Finally, in this context, defendant must do more than show trial court error; he must also show that he in fact did not receive a fair trial. (*People v. Jenkins, supra*, 22 Cal.4th at p. 943.) Only two of the jurors who deliberated in defendant's case indicated they had heard or read a news report about the case. Neither juror could remember the substance of the report, and both stated they could decide the issues in the case without bias. Defendant also did not exercise peremptory challenges to remove these jurors. For these reasons, defendant has failed to establish that the trial court erred in denying his motion for a change of venue, and he has failed to establish prejudice.[2]

---

[2]With respect to many of defendant's claims of reversible error, he asserts—without elaboration or discussion—violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and in some cases also the Fourth and Seventh Amendments to that Constitution. He also asserts violations of corresponding provisions in the state Constitution. In addressing each claim, we have considered whether the alleged error violated his federal or state constitutional rights, and our rejection of each claim, including the instant claim, constitutes a concurrent determination that the alleged error does not warrant reversal on constitutional grounds.

### 2. Trial Court Did Not Improperly Curtail Voir Dire by Striking Portions of Defendant's Juror Questionnaire.

■ Defendant argues the trial court excluded certain questions from his proposed jury questionnaire, preventing him from learning of possible juror bias. Defendant sought to include the following questions:

"What has been your favorite job and what (do/did) you enjoy about it?"

"What has been your least favorite job and what (do/did) you dislike most about it?"

"If you were a supervisor or employer, what do you think is the best way to keep workers in line?"

"A person should maintain his or her belief on a subject so long as he or she feels that belief is right. Strongly Agree___ Agree Somewhat___ Disagree Somewhat___ Strongly Disagree___ Please explain."

Defendant argues that the first two questions would have uncovered biases based on whether a prospective juror liked or disliked the defendant's job or the jobs of the victims. The third question, according to defendant, would have uncovered whether any of the prospective jurors had a domineering personality that might cause him or her to commandeer the jury. Defendant asserts the fourth question would have uncovered whether a prospective juror's personal beliefs would prevent him or her from following the law.

The trial court has discretion to limit voir dire, and the court abuses that discretion, warranting reversal of a conviction on appeal, only when its decision falls outside the bounds of reason (*People v. Waidla* (2000) 22 Cal.4th 690, 713-714 [94 Cal.Rptr.2d 396, 996 P.2d 46]) resulting in a "miscarriage of justice." (Code Civ. Proc., § 223.) Defendant's assertion that his proposed questions would have ferreted out hidden juror bias is baseless. The trial court permitted defense counsel to question the panel orally, telling counsel: "[Y]ou can ask any questions you want[] that are not in your questionnaire." Counsel therefore had express permission and ample opportunity to ask the very same questions that defendant now complains the court erroneously prevented him from asking. (Cf. *People v. Horton* (1995) 11 Cal.4th 1068, 1093 [47 Cal.Rptr.2d 516, 906 P.2d 478].)

Furthermore, the court allowed a 31-page juror questionnaire that sufficiently covered the areas of inquiry defendant now claims he was unable to pursue. For example, the questionnaire as submitted to the jury asked jurors

to list their jobs, thus permitting defendant to identify any possible biases based on employment background. As for defendant's proposed question about whether one should maintain a belief so long as one feels the belief is right, the question made no sense. If one feels a belief is right, then one necessarily maintains the belief—that is what maintaining a belief means. Obviously, such a confusing question served no legitimate purpose on voir dire. Defendant asserts the question would have disclosed whether prospective jurors could follow the law, but the trial court's replacement question was much better suited to that purpose: "If the judge gives you any instruction in law and it differs from your beliefs or opinions, how will you deal with that conflict?" Defendant does not explain what he would have learned from his proposed question that he was unable to learn from the court's replacement question.

The proposed question regarding what was "the best way to keep workers in line" was also confusing, and the trial court excluded the question on that basis. If defendant wanted to determine if any prospective juror had a domineering personality, he could have suggested a modification of the question, clarifying what he meant by "keep[ing] workers in line," or more to the point, he could have asked a question that focused on the prospective juror's conduct among peers rather than in a supervisory role. We find no error.

### 3. The Trial Court's Orders and Procedures During Voir Dire Did Not Result in a Jury Biased in Favor of the Death Penalty.

■ Defendant complains that, during voir dire, the court asked three questions designed to elicit anti-death-penalty bias but only one question designed to elicit pro-death-penalty bias. He asserts that this questioning unfairly skewed the jury in favor of a death verdict because it more effectively "weed[ed] out" jurors who opposed the death penalty than jurors who favored the death penalty. Defendant's argument is based solely on a numerical counting of questions, which is not sufficient to establish a constitutional violation in this context. Defendant does not explain why the content of the questioning somehow failed to identify jurors who were inappropriately biased in favor of the death penalty, nor does he state what additional questions the court should have asked. Moreover, defendant had opportunity during voir dire to ask additional questions, and in fact the juror questionnaire asked jurors their feelings about the death penalty and whether those feelings would affect their deliberations. We find no error.

■ Defendant also argues that the trial court's individual questioning of jurors about pro-death-penalty bias was "hasty, coercive and abbreviated"

and that the court permitted only a few written questions per attorney. Specifically, defendant complains that he could not directly question Juror Jack C.; instead, the court required defendant to submit his questions in writing to the court. The record establishes that the court examined Juror Jack C. at length, and this juror made clear that his vote for or against the death penalty would depend on the facts of the case. The court specifically inquired about Juror Jack C.'s comment on his questionnaire that he believed the death penalty should be carried out if deserved. The court also asked additional questions of Juror Jack C. after receiving defense counsel's written questions, and though the record is unclear, the court apparently asked the specific questions defense counsel had submitted. The court did not limit the number of written questions defense counsel could submit, and defendant does not state any specific question that the court failed to ask. We discern no error.

Defendant further argues that certain jurors were biased. He asks us to reverse the guilt and penalty verdicts, asserting harmless error analysis is inappropriate. Specifically, defendant argues alternate Juror Patricia F. was biased against people who use drugs and erroneously believed that drug use was an aggravating factor. Juror Patricia F. did not participate in deliberations, and therefore any biased or erroneous views she may have held could not have affected the verdict. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1177 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Defendant next asserts that Juror Julanne B. was biased because she had seen a headline about defendant's crimes and could not remember if she read the story. He also asserts that some of the answers she gave on her juror questionnaire reflect bias. Defendant does not explain why seeing a headline about a crime, and reading but then forgetting the story, would make one biased. (See *People v. Jenkins, supra,* 22 Cal.4th at p. 945.) As for her juror questionnaire, Juror Julanne B.'s equivocal answers simply reflect the ambiguity of the questions. For example, the questionnaire asked: "If the judge gives you any instruction in law and it differs from your beliefs or opinions, how will you deal with that conflict?" Juror Julanne B. answered: "[D]epends on what it is." Clearly, she was stating she could not answer the question in the abstract. Her answer does not establish bias or an inability to follow the law in a death penalty case. She also stated on the questionnaire her belief that drug addiction usually causes the addict to steal and lie, and she indicated her dislike of drug users. Again, her opinions do not establish bias or disqualify her from sitting as a juror. When asked whether she agreed that someone who intentionally kills another person or intentionally kills more than one person should always get the death penalty, she answered: "Agree Somewhat—would have to know all the circumstances." That answer hardly indicates bias; rather, it indicates the sort of open-mindedness

the law requires of jurors. Finally, defendant points out that Juror Julanne B.'s husband was a retired police officer, but he does not explain why this fact should disqualify her from jury service. In short, we find no bias. Moreover, defense counsel did not challenge Juror Julanne B. for cause, nor did he exercise his peremptory challenges to remove Juror Julanne B. from the jury, and therefore he forfeited any objection to her sitting as a juror. (*People v. Staten* (2000) 24 Cal.4th 434, 454 [101 Cal.Rptr.2d 213, 11 P.3d 968].)

Defendant argues he was not able to examine the jurors concerning racial bias, as well as bias related to the nature of defendant's crimes and bias favoring the testimony of police officers. Defendant, however, does not assert any instance when the court barred him from asking questions along these lines, and his juror questionnaire did in fact address these issues.

Defendant argues that a statement we made in *People v. Medina* (1995) 11 Cal.4th 694 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*) is unfair to capital defendants in light of *People v. Pinholster* (1992) 1 Cal.4th 865 [4 Cal.Rptr.2d 765, 824 P.2d 571], and he asks us to reexamine what we said in *Medina*. In *Medina*, we indicated that a trial court might be able to prohibit questioning of jurors as to whether they would automatically vote for death in a case involving multiple murders. We noted that death qualification of a jury should focus on the jurors' attitudes about the death penalty *in the abstract* and should not ask jurors if they would or would not choose the death penalty based on the *specific evidence to be introduced at trial.* (*Medina*, at pp. 745-746.) In *Pinholster*, however, we held that the trial court did not err when it inquired of two jurors whether those jurors could impose the death penalty in a burglary-murder case. We noted that the Legislature had determined that burglary murder was a crime that qualified one for the death penalty, and that if a juror categorically could not vote for the death penalty in a burglary-murder case, then he or she could not follow the law. (*Pinholster*, at p. 917; see also *People v. Cash* (2002) 28 Cal.4th 703, 718-723 [122 Cal.Rptr.2d 545, 50 P.3d 332] [defendant should have been permitted to question jurors about whether they would automatically impose the death penalty in a murder case where the defendant had previously committed another murder].) Defendant argues that *Medina* prevented him from asking jurors if they would automatically impose the death penalty in a double-murder case, whereas under *Pinholster*, the People are free to inquire whether any jurors would automatically refuse to impose the death penalty in a burglary-murder case. This imbalance, he claims, led to a jury that was biased in favor of the death penalty, in violation of his rights under the federal Constitution.

We need not decide the continuing validity of our comment in *Medina*, because here the trial court did not prevent defendant from asking jurors

whether they would automatically impose the death penalty in a multiple-murder case, and defendant did ask such a question.

■ Finally, defendant argues the trial court improperly restricted his ability to examine prospective jurors individually and in sequestration about their views on the death penalty. Defendant relies on *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], though the rule of *Hovey* was abrogated by Code of Civil Procedure section 223. (*People v. Waidla, supra,* 22 Cal.4th at pp. 713-714.)

■ We defer to the trial court's discretion regarding the conduct of voir dire. (*People v. Waidla, supra,* 22 Cal.4th at pp. 713-714.) ■ Here, the trial court required defendant to question prospective jurors in the presence of the other jurors but agreed to sequestered questioning of certain jurors and also permitted defendant to request sequestered questioning of additional jurors on a case-by-case basis after preliminary questioning was complete. The court explained: "I've got a statute [(Code Civ. Proc., § 223)] that tells us what we're supposed to be doing here, and I'm not about to . . . allow [sequestered questioning] of a number of jurors until I have a chance to kind of hear what they have to say." The court's procedure in this regard does not amount to an abuse of discretion. In addition, defendant nowhere states what questions he was unable to ask jurors as a result of the trial court's rulings, nor does he describe any specific example of how questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias. Accordingly, he has not established prejudice.

### 4. *Trial Court Did Not Err When It Excused Juror Norma K. for Cause.*

■ Defendant argues the trial court erred in removing prospective Juror Norma K. for cause. Juror Norma K.'s statements amply support the trial court's determination to remove her for cause. For example, in response to the question, "Can you think of any case where you'd impose the death penalty based upon your statement that you don't think you should take a life?," Juror Norma K. said: "No, I don't believe so." She remained consistent in this view during repeated questioning, but eventually acknowledged "it could happen" that the circumstances of a case might be so "depraved and bad and terrible" that she "might" vote for the death penalty. When a prospective juror has made conflicting statements regarding his or her ability to remain impartial and apply the law despite strong personal beliefs, we accept as binding the trial court's assessment. (*People v. Lewis* (2001) 25 Cal.4th 610, 631 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Here, Juror Norma K.'s remarks easily supported the trial court's decision to remove her for cause.

5. *Trial Court Did Not Err in Failing to Remove Juror Sam F. for Cause.*

■ During voir dire, Juror Sam F. sent a note to the court stating he had a hearing problem and was concerned he would not be able to follow the proceedings at trial. Defendant argues that the court erred in failing to remove Juror Sam F. for cause. Defendant forfeited this issue because he did not bring a motion in the trial court to remove Juror Sam F., and in fact accepted the panel immediately after learning of the problem. (*People v. Ochoa* (1998) 19 Cal.4th 353, 444 [79 Cal.Rptr.2d 408, 966 P.2d 442].) In any case, the trial court felt that Juror Sam F.'s hearing problem might not be as bad as his note indicated, and the court responded to the note by allowing Juror Sam F. to sit closer to the witness box. The record includes no evidence that this solution was inadequate.

6. *Trial Court Properly Denied Defendant's Motion to Exclude.*

■ Prior to trial, defendant moved to exclude certain items of evidence found in the carport behind the apartment complex where he and his victims lived. The evidence at issue was a shirt, a baby blanket, a black telephone, and a wristband from the county jail, bearing defendant's name. The motion, which defendant made orally, questioned the relevancy of the evidence and asserted that the danger of undue prejudice substantially outweighed the probative value of the evidence. (Evid. Code, § 352.) The trial court denied the motion without prejudice. Defendant now argues the trial court erred. It did not.

Defendant did not provide the court with sufficient context by which to evaluate—pretrial—the merits of his motion. The court had no means to measure the relevancy of the various items of evidence, and therefore it denied the motion without prejudice. Defendant did not renew his motion when the items of evidence were offered at trial, at which time the relevance of the evidence could have been better evaluated, and therefore he has not preserved the issue. (*People v. Morris* (1991) 53 Cal.3d 152, 189-190 [279 Cal.Rptr. 720, 807 P.2d 949].) Moreover, defendant's motion lacked merit. Police found a knife on the carport roof, where the murderer may have thrown it in an effort to conceal it. The prosecution's experts concluded the knife could have been the murder weapon. If the prosecution could somehow link the knife to defendant, it would be an important piece of evidence tending to establish defendant's guilt. Therefore, it was very significant that police also found several items connected to defendant inside the same carport. The black telephone was particularly significant because it came from defendant's apartment and, according to prosecution witnesses, defendant offered to sell a telephone just hours before the murders. In other words,

the items of evidence in the carport tended to show that defendant was in the vicinity of the carport shortly before the murder, which in turn tended to connect him to the possible murder weapon. Accordingly, these items were relevant, and their admission was not unduly prejudicial.

Defendant argued in the trial court that, at least in the case of the county jail wristband, the danger of undue prejudice outweighed the evidence's probative value. The prosecutor, however, agreed not to mention the wristband in opening argument, and he never offered it into evidence at trial. Therefore, to the extent the trial court should have granted the motion as to the wristband, no prejudice arose. We conclude that the trial court did not abuse its discretion in denying defendant's motion to exclude certain evidence, and the court's ruling did not violate defendant's rights under the Fourth Amendment to the federal Constitution. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

B. *Guilt Phase Issues*

 1. *Defendant Was Not Excluded from Any Proceeding That Bore a Reasonably Substantial Relation to His Opportunity to Defend Himself.*

 Defendant seeks reversal of the judgment because he was not present at certain in-chambers conferences. To prevail on a claim of this type, a criminal defendant must show that "his presence at the . . . conferences [from which he was excluded] bore a reasonably substantial relation to his opportunity to defend himself." (*People v. Ochoa* (2001) 26 Cal.4th 398, 433 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Defendant complains that he was not present at a conference on April 10, 1991, at which his attorney told the court he was having trouble tracking down a particular defense witness and asked the court to issue a bench warrant for the arrest of the individual. The court agreed to do so, but then the witness appeared, making the matter moot. The record does not make clear why defense counsel wanted to handle this matter in chambers without defendant present, but the record includes the following colloquy:

"The Court: [Defense Counsel], I understand that you have to kind of walk a fine line here between the representation of your client, not divulging things sometimes even in camera that you feel you shouldn't divulge[,] and the [] prescriptions of [section] 190.9 [requiring all proceedings to be on the record]. [¶] But it was my understanding, without asking you for any real specifics, that you had a reason to want to conduct this hearing among just us this morning rather than having your client present; that you didn't feel it was necessary, and, in fact, in terms of your overall representation and your

view of and knowledge of this case, that that's what you desired to do. [¶] Is that a fair statement?

"[Defense Counsel]: Yes, your honor. [¶] I don't want to encourage the absenteeism of any witness, and I had no reason to believe that I would be encouraging such. [¶] By the same token, I don't want to plant a seed, and, therefore, I prefer to handle the matter in camera. [¶] I would indicate that I have indicated to my client that I have the witness . . . ."

Though this exchange is difficult to interpret, it appears defense counsel did not want defendant to know he was seeking a bench warrant for the arrest of the witness, perhaps because defendant felt some loyalty to the witness, who, as noted, was defendant's drinking companion immediately prior to the murders. In any case, the entire matter became moot when the witness appeared voluntarily. Defendant argues that the record "smacks of the most pernicious form of deceit designed to shield defense counsel from airing . . . attorney-client conflicts," but defendant does not explain how his absence from the conference, the substance of which became moot, "bore a reasonably substantial relation to his opportunity to defend himself." (*People v. Ochoa, supra*, 26 Cal.4th at p. 433.) We find no error.

Defendant argues that his exclusion from other *unspecified* conferences violated his rights, requiring reversal. Again, defendant does not explain how his absence adversely affected his defense other than to speculate that "[i]t is reasonable that had [he] been present to contribute and confer with his attorney, the outcome of the in-chambers conferences would have been altered, as well as the outcome of the trial." That sort of vague speculation does not establish a breach of defendant's statutory rights or a violation of his state or federal constitutional rights. (*People v. Ochoa, supra*, 26 Cal.4th at p. 433.)

2. *The Trial Court Did Not Improperly Exclude Defense Evidence.*

 Defendant relied in part on an intoxication defense at trial. In this regard, defendant argues the trial court should have permitted him to elicit testimony from defense witnesses Grace Ignacio and Elizabeth Gerencser to the effect that defendant looked like he was under the influence of cocaine during the day preceding the murders. The prosecution objected to this testimony for lack of foundation.

Lay opinion regarding drug intoxication is admissible so long as the party eliciting the evidence establishes a foundation. (*People v. Williams* (1988) 44 Cal.3d 883, 914 [245 Cal.Rptr. 336, 751 P.2d 395].) In the case of Grace

Ignacio, defendant attempted to establish a foundation by asking, "Have you seen people on drugs before?" Ignacio responded that she had not. Therefore, the trial court did not err when it prevented her from testifying as to whether defendant had the "appearance . . . of someone who might be on drugs." In the case of witness Gerencser, defendant attempted to establish a foundation by asking, "Have you ever seen somebody on coke?" Gerencser responded, "Not really," but she admitted she had "heard about it" or "read about it." Again, defendant did not establish that the witness was sufficiently knowledgeable about cocaine use to give an opinion as to whether defendant was under the influence of that drug. Therefore, the trial court did not err when it prevented Gerencser from testifying as to whether she had "a suspicion he might have used some cocaine."

Defendant also argues the trial court erred when, in the course of defendant's cross-examination of victim Bridgett Morales, the court sustained the prosecution's relevancy objection to the following question: "[Have you] found it comfortable to be around other individuals who are using drugs when you use drugs?" Defendant does not explain how the answer to this question was relevant, instead asserting that the court's ruling was an "absolute denial of further inquiry into matters critical to [the] defense (e.g., victim Morales' credibility) . . . ." It was not.

Finally, defendant argues the trial court should have permitted defense witness Elizabeth Gerencser to testify that she had a handicapped child. In making this argument, defendant wrongly asserts that this testimony came at the penalty phase of defendant's trial and would have established that defendant was a kind person because he helped Gerencser care for her child. In actuality, however, this testimony came at the guilt phase, and defense counsel offered no reason for why the child's disability, if any, was relevant. We find no error.

### 3. Trial Court Did Not Erroneously Admit Unduly Prejudicial Evidence.

Defendant asserts the trial court permitted evidence for which the risk of undue prejudice outweighed the probative value. (Evid. Code, § 352.)

### a) Photographs

■ First, defendant claims prejudice based on the admission of so many photographs depicting the bloody bodies of the victims, various items of bloody clothing, the blood-spattered crime scenes, and various knives. Defendant argues that this evidence was cumulative and likely to inflame the

passions of the jurors. In a separate argument, defendant challenges the admission of three photographs in particular. The first depicts Converse while alive, holding a camera, with her face blacked out. The second depicts Converse's naked chest, showing several stab wounds concentrated in the area between her breasts. The third depicts Converse's body, facedown, pants and underwear around her ankles, and hands and feet tied together. The testimony established that this last picture depicted Converse's body as found by police.

"[T]he decision to admit victim photographs is a discretionary matter we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1168 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Here, the trial court reviewed the photographic evidence and admitted some photographs, judging them to be relevant and not unduly prejudicial, and excluded others, judging them to be cumulative. As to one photograph, the court admitted it tentatively, permitting defendant to renew his objection when the photograph was to be presented to the jury during the course of trial. As to other photographs, the court admitted them only for purposes of the penalty phase. We have reviewed the photographs in question and conclude the trial court did not abuse its discretion in ruling as it did. (*Taylor*, at pp. 1168-1169; *People v. Lewis, supra*, 25 Cal.4th at p. 642.)

In particular, the photograph depicting Converse holding a camera was relevant to show the camera that was missing from Converse's apartment after the murder, thereby establishing a possible motive for the murder. At defendant's request, Converse's face was blacked out, and defendant did not then object to admission of the photograph. We do not see how this photograph could have caused any undue prejudice. The photograph depicting Converse's naked chest was relevant to show the dense concentration of stab wounds to her heart area, thereby allowing the jury to infer that the killing was intentional. The testimony was clear that Converse's shirt was on when police found her, and therefore the jury was not misled to believe defendant had removed her shirt. The photograph was certainly gruesome, but a defendant does not have a right to prevent the jury from seeing the victim's injuries when such evidence is relevant to establish intent. Finally, the photograph depicting Converse with her pants and underwear around her ankles and her hands and feet tied together was relevant to show that the murderer immobilized Converse before killing her, again allowing the jury to infer that the killing was intentional.

Defendant argues that the prosecution could have established (and in fact did establish) the same facts by less prejudicial means. We have repeatedly

rejected this argument in similar contexts. (See, e.g., *People v. Box* (2000) 23 Cal.4th 1153, 1199 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Defendant also argues undue prejudice based on the "sexually suggestive nature" of the photographs, but it was the nature of the crime against Converse that made it necessary for the jury to see her without clothes. When the victim of a murder has been stabbed directly between the breasts and left with her pants and underwear around her ankles, the defendant cannot complain that the jury is exposed to images of her nudity. We find no error in the court's decision.

Defendant also asserts the photograph, incidentally depicting a tattoo on defendant's arm, was unduly prejudicial because of negative societal attitudes about tattoos. The photograph in question was relevant to show that defendant had fresh scratches on his body when arrested shortly after the murders, and defendant points to nothing in the record suggesting that any member of the jury was biased against persons having tattoos. Accordingly, we reject the claim. (See, e.g., *Rich v. Calderon* (9th Cir. 1999) 187 F.3d 1064, 1070 [no prejudice from evidence of tattoo]; *United States v. McCarthy* (9th Cir. 1970) 430 F.2d 1289, 1291 [same].)

### b) *Testimony of investigating officers*

Defendant further claims error based on the testimony of one of the police officers who investigated the scene of the Hickman murder. Sergeant Charles Rosales testified about the condition of Hickman's apartment at the time he found her. The prosecutor then asked about Hickman's body: "Just looking at her . . . without turning her over, could you tell how many wounds were on her?" Sergeant Rosales responded, "No, sir. There were so many stab wounds. [¶] *In 22 years of police work I've never seen anybody stabbed this many times.*" (Italics added.) Defense counsel immediately objected, and the court struck Sergeant Rosales's statement and told the jury to disregard it. Defendant then sought a mistrial, arguing that the officer had provided a "commentary on the proportionality of homicides" and was "putting th[e] case on the extreme spectrum." The court rejected defense counsel's request but again admonished the jury to disregard Sergeant Rosales's statement "as if you had never heard it." On appeal, defendant argues that the officer's statement was highly prejudicial because, if a juror felt that the death penalty should apply only in the most serious of cases, the officer's statement confirmed that this case fell into that category.

We conclude the court handled the matter appropriately. The court twice admonished the jury to disregard the statement. Moreover, the autopsy evidence indicating Hickman had been stabbed almost 50 times was, by

itself, sufficient to cause the jury to conclude that this murder was unusually brutal. Sergeant Rosales's statement did not likely affect the jury's conclusion in this regard. We do not think "defendant's chance of having a fair trial" suffered "irreparable damage." (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

Defendant further objects to certain testimony of Sergeant Robert Perry of the Los Angeles County Sheriff's Department. Sergeant Perry retrieved defendant's jeans from the home of Benny Garcia. He testified that the jeans lacked a button and that the button "appeared to be ripped from its position." Defense counsel objected, but the court overruled the objection. Defendant argues on appeal that the evidence was unduly prejudicial because it reinforced an idea the prosecution was trying subtly to advance that defendant had lost the button "in the heat of an unlawful sexual encounter." Defendant notes that the prosecution had dropped sexual assault allegations. We find no error. A button that is pulled from a pair of jeans will likely stretch or tear the cloth in a distinct way as compared to a button that is cut off or falls off as a result of ordinary use. Sergeant Perry had examined the jeans and was qualified to give his lay opinion that the button had been removed by force, and the evidence shed light on the circumstances of the crime.

c) *Forensic evidence*

Defendant next argues that the testimony of Lynne Herold and Elizabeth Kornblum, both criminalists with the Los Angeles County Sheriff's Department, was unduly prejudicial with only slight probative value. Defendant did not object to this testimony at trial, and therefore he forfeited the issue. (Evid. Code, § 353.) In any case, we see no error. Herold testified that fibers she had taken from the rivet-type button found near Hickman's body matched (in color and material) fibers in the jeans that Sergeant Perry had retrieved from Benny Garcia's house, and the button was the type usually used on similar jeans from the same manufacturer. This testimony tended to place defendant in Hickman's apartment and supported the conclusion that he was involved in a struggle in that apartment. Defendant asserts the evidence was unduly prejudicial, but he does not explain why. We find no prejudice.

Elizabeth Kornblum testified that blood on defendant's jeans matched Hickman's blood and the blood of only a very small percentage of the general population. In addition, the blood did not match defendant's blood. This testimony certainly was prejudicial, but nothing about the testimony would have caused the jury to make its decision on improper grounds. We find no undue prejudice, no ineffective assistance of counsel, and no error.

Defendant argues that the trial court should not have permitted Los Angeles County Deputy Sheriff Dale Falicon to testify that he compared palm prints and fingerprints found in the murder victims' apartments with defendant's prints as they appeared on a card dated December 3, 1989 (a few days *before* the murders), from the Covina Police Department. Defendant asserts that other fingerprint cards depicting defendant's prints were available, and the card from the Covina Police Department indirectly informed the jury of defendant's prior arrest experience. Defense counsel raised this same objection at trial, and the prosecution responded that reference to the Covina Police Department card was necessary because investigators used that same print card on the day immediately following the murders to identify defendant as the primary suspect. The prosecution wanted to make clear to the jury that police did not single out defendant unfairly. The court ruled that the evidence was relevant but ordered that no mention be made of when or why the Covina Police Department obtained defendant's prints. We think it unlikely that the jury speculated as to how the Covina Police Department obtained defendant's prints. Deputy Sheriff Falicon made only one brief mention of having an exemplar of defendant's prints prior to his arrest in this case, and the jury's attention was not drawn to the point. Moreover, as the prosecution argued, the evidence was relevant to show why the investigation focused on defendant. Defendant could have, but did not, offer to stipulate that his fingerprints were inside the murder victims' homes. We find no error.

### 4. *Judgment, Verdicts, and Findings Are Supported by Substantial Evidence.*

Defendant argues that his intoxication at the time of the crimes prevented him from forming the mental state requisite to each of the charges and allegations. Similarly, he argues the prosecution failed to present substantial evidence of his *lack* of intoxication. Of course, evidence of the inability to *form* a particular mental state due to intoxication is not admissible. (§ 22, subd. (a).) Nevertheless, we will assume defendant is arguing that the evidence of intoxication established his actual lack of the necessary mental state, rather than his inability to form that state.

"To determine the sufficiency of the evidence to support a conviction, [we] review[] the entire record in the light most favorable to the prosecution . . . ." (*People v. Silva* (2001) 25 Cal.4th 345, 368 [106 Cal.Rptr.2d 93, 21 P.3d 769].) Here, the evidence showed that defendant had been drinking beer and had also smoked cocaine during the day and evening prior to the murders, but the record includes no direct evidence of defendant's level of intoxication at the time of the murders or

the subsequent assault on Ms. Morales. The evidence does suggest, however, that defendant's mental functions were not significantly impaired. He gained entry to the locked apartments of his murder victims, bound the hands and feet of one of his victims, and stabbed them both repeatedly in targeted locations that would likely lead to death. He then concealed the murder weapon and fled the scene. He told his third victim where to drive, used the ruse of a secret to get close enough to her to assault her, and then took her car. This behavior does not characterize someone who is so intoxicated that he does not intend his actions.

██ Defendant also asserts the evidence was insufficient to show that he entered the apartments of the victims with the intent to steal (burglary counts) or that he intended to take their property by means of force or fear (robbery counts), because he may have formed the intent to steal after the victims were dead. He argues that a dead person cannot feel fear and therefore cannot be the victim of a robbery or attempted robbery, and he points out that the record includes no evidence the victims were alive when he took their property.

We think the evidence amply supports the burglary, robbery, and attempted robbery convictions, as well as the related special circumstance findings. The evidence showed that defendant was seeking money during the day prior to the murders, that he took Converse's property after murdering her, and that he struggled with Hickman, creating an audible disturbance. The jury was entitled to infer from this evidence that he entered the victims' apartments with an intent to steal, that he murdered his victims in order to take their property, and that he fled Hickman's apartment without taking her property, because his struggle with her became noisy. While it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property. (See, e.g., *People v. Frye* (1998) 18 Cal.4th 894, 955-956 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Defendant's arguments are without merit.

### 5. Trial Court's Handling of the Jurors' Concerns About Their Safety Did Not Deny Defendant a Fair Trial.

██ Defendant argues that Juror Todd R. developed a bias against defendant because the evidence at trial made him fear defendant, and therefore the court should have removed him for cause. During the presentation of the People's case, Juror Todd R. gave the court a note that read: "Your Honor, I would like the response to my question not to be answered in court, but done privately, or in the jury room. [¶] Has [defendant] seen or

have access to the questionnaires? [¶] My concern is for property and family." The court's discussion of this juror question with counsel came immediately after a witness testified about the gruesome crime scene, and defendant asserts the note was in response to that testimony, though the record is unclear as to precisely when the juror sent the note. During discussion of the note, defense counsel raised the issue of Juror Todd R.'s ability to remain impartial, and the clerk also told the court that Juror Todd R. had indicated that other jurors shared his concerns.

The court responded to the note in front of the entire jury, without privately discussing the note with Juror Todd R. and without permitting counsel to question him. The court assured the jury that no one other than the court, the clerk, and counsel had seen the questionnaires, that they would be placed under seal, and that the identities of specific jurors would not be public information. The court also encouraged the jurors that, if any of them felt unable to be "fair" and "unbiased," to let the court know in writing.

Defendant assumes that, because the juror had concerns about his family's safety and the safety of his property, he was therefore biased against defendant, requiring his removal. The record belies this assumption. The court specifically asked the jurors to report if they could no longer be fair and unbiased, and Juror Todd R. did not pursue the matter further, apparently satisfied by the court's assurances. A decision whether to remove a juror for cause rests in the discretion of the trial court. (*People v. Ochoa, supra,* 19 Cal.4th at p. 417.) We find no abuse of discretion.

Defendant also argues the court's response to Juror Todd R.'s note validated the jurors' fears about defendant, thereby causing the jury to conclude that defendant was guilty before it had even heard the defense case. Defendant argues the court should have reminded the jury not to decide issues in the case before hearing all the evidence and should have told the jury that the jurors' questions and the court's responses were not evidence. Defendant further asserts the court took inadequate steps to uncover "latent bias[es]" jurors might have had on account of fearing defendant. Defendant did not raise any of these arguments at trial. Moreover, we think the steps the court took were appropriate and sufficient. The court addressed the jurors' concerns about confidentiality without unnecessarily implicating defendant or calling the attention of the entire jury to the specifics of Juror Todd R.'s fears and thereby possibly spreading those fears. The court encouraged jurors to come forward if any of them felt unable to remain impartial. In addition, on the same day, the court reminded the jury not to prejudge the case, saying: "Let me tell you what you shouldn't do. . . . [¶] . . . Don't form any opinion or conclusion until this matter has been submitted to you." Accordingly, we find no error.

Finally, defendant objects that he was excluded from the conference at which the court discussed Juror Todd R.'s note with counsel. Juror Todd R. expressly requested that his note be answered in private, and the court presumably discussed the note without defendant present in deference to this request. Defendant complains he spent the remainder of the trial unaware the jurors found him frightening, but informing defendant of Juror Todd R.'s safety concerns might have only increased Juror Todd R.'s fear of defendant, thereby exacerbating the whole problem. Under the circumstances, we think the court handled the matter appropriately.

### 6. *Trial Court's Efforts to Expedite the Trial Did Not Deny Defendant a Fair Trial.*

Defendant argues that a few time-saving decisions by the court, as well as comments the court made indicating a preference for moving the trial forward as quickly as possible, worked to deny him a fair trial. Defendant does not cite any authority in support of his argument and does not explain how the court's time-saving measures interfered with his defense. He argues that the time constraints imposed on defense counsel during voir dire led to the seating of several jurors who were biased or otherwise unqualified, but in this regard he only mentions Jurors Patricia F., Julanne B., Todd R., and Sam F. As already discussed, the trial court did not err in any of its decisions with respect to these jurors. Defendant also suggests that time pressure prevented defense counsel from making certain evidentiary objections and caused the court to deny his evidentiary objections without due consideration, but he does not identify any erroneous rulings and he does not state what evidence the court improperly admitted. We find no error.

### 7. *Trial Court Correctly Instructed the Jury.*

#### a) *CALJIC No. 2.02*

The trial court instructed the jury in accordance with CALJIC No. 2.02, which addresses how a jury should evaluate evidence of a defendant's mental state. Defendant argues the instruction compromises the constitutional requirement of proof beyond a reasonable doubt because it requires the jury to find the absence of the alleged mental state where the evidence "is susceptible to two reasonable interpretations," and this rule works against the defendant in the case of an exculpatory mental state. Defendant acknowledges that we upheld this instruction in *People v. Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009], and he states that he asserts this argument to preserve it for anticipated federal proceedings. We continue to adhere to our prior decisions upholding the instruction. (See,

e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 181 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

 b) *CALJIC No. 2.52*

The trial court instructed the jury in accordance with CALJIC No. 2.52, which addresses how a jury should evaluate evidence that a defendant fled the crime scene. Defendant argues the instruction was improper on several grounds. First, he argues that, where the evidence suggests reasons for flight other than consciousness of guilt, the court should instruct the jury that it must determine whether the evidence in fact shows a consciousness of guilt. We rejected this contention in *People v. Barnett* (1998) 17 Cal.4th 1044, 1052-1053 [74 Cal.Rptr.2d 121, 954 P.2d 384], and do so again here. Second, defendant argues the court should have instructed the jury that it must find, prior to using evidence of flight for any purpose, that the alleged flight relates to a particular charged offense. For example, a defendant might flee from a crime scene on account of a minor crime he *did* commit, though he had no connection with a more serious crime he *did not* commit. We rejected a similar contention in *People v. Mendoza, supra,* 24 Cal.4th at page 180, saying: "It is for the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply." (See also *People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423].) ▉ Third, defendant argues that, with respect to robbery, the crime continues until the stolen property is carried to a position of relative safety, and therefore flight *with the victim's property* is part of the offense and not evidence that may be used to establish consciousness of guilt. We disagree. Though the crime of robbery continues "as long as the loot is being carried away to a place of temporary safety," "for purposes of establishing guilt, the asportation requirement is initially *satisfied* by evidence of slight movement." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165 [282 Cal.Rptr. 450, 811 P.2d 742].) Therefore, defendant did not need to flee the scene of his crimes to be guilty of robbery, and his flight is evidence of his consciousness of that guilt. Finally, defendant argues that intoxication or mental impairment might preclude consciousness of guilt and therefore that the court should have instructed the jury not to consider evidence of flight unless it first concluded defendant was in fact fleeing. Defendant's theory turns the instruction on its head. The purpose of presenting evidence of flight is to establish consciousness of guilt, but defendant argues the jury should first have found that defendant had a guilty conscience before considering the evidence of flight. We disagree.

 c) *CALJIC No. 9.40*

▉ The trial court instructed the jury in accordance with CALJIC No. 9.40, which explains the elements of robbery. Defendant argues the court

should have explained for the jury the meaning of the phrase "immediate presence," which appears in that instruction.

In the absence of a specific request, a court is not required to instruct the jury with respect to words or phrases that are commonly understood and not used in a technical or legal sense. (*People v. Smithey* (1999) 20 Cal.4th 936, 981 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) We think the phrase "immediate presence" was sufficiently clear in the context of this case that no further clarification of the phrase was necessary. Moreover, defendant does not explain how the clarification he proposes—which would have instructed the jury that the phrase refers to property that is so within a victim's control that violence or fear is necessary to wrest it away—would have caused the jury to reach a different result here, where the evidence indicates defendant took Converse's property from within her home.

### d) *CALJIC Nos. 4.20 and 4.21*

As to robbery, burglary, murder, and the great bodily injury allegation, the court instructed the jury on what specific intent or mental state was necessary and then added, in accordance with CALJIC No. 4.21: "If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such specific intent." Later, the court gave a separate set of instructions applicable to the "lesser related offenses or lesser included offenses." The court explained that these offenses required only a "general criminal intent," not a "specific intent or specific mental state." The court then repeated, "I'm now talking to you about these lesser related offenses." It defined "general criminal intent" and then added, in accordance with CALJIC No. 4.20: "[N]o act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. [¶] *In the crime charged in those lesser included or lesser related offenses, all of which would be general intent offenses*, the fact that the defendant was voluntarily intoxicated *as to those charges* is not a defense and does not relieve him of responsibility for the crimes if you should so find." (Italics added.)

Defendant argues the CALJIC No. 4.20 instruction was improper because some of the crimes with which he was charged were specific intent crimes. (See *People v. Rivera* (1984) 162 Cal.App.3d 141, 145 [207 Cal.Rptr. 756]; *People v. Ford* (1964) 60 Cal.2d 772, 796 [36 Cal.Rptr. 620, 388 P.2d 892].) We see no possibility of jury confusion under the circumstances presented. Here, the court made very clear that its CALJIC No. 4.20 instruction related *only to the general intent crimes*, and the court did not give the instruction when discussing the specific intent crimes and allegations. In addition, the

written instruction bore the caption: "VOLUNTARY INTOXICATION—NOT A DEFENSE *TO GENERAL INTENT CRIMES*." (Italics added.) By contrast, the court's written CALJIC No. 4.21 instruction bore the caption: "VOLUNTARY INTOXICATION—WHEN RELEVANT *TO SPECIFIC INTENT*." (Italics added.)

Defendant asserts the trial court should have explained to the jury that CALJIC No. 4.21 states an exception to the rule stated in CALJIC No. 4.20. (See *People v. Rivera, supra,* 162 Cal.App.3d at p. 145.) We think the court made sufficiently clear that these instructions operate in distinct spheres. The court did not give its CALJIC No. 4.20 instruction until *after* it had instructed with respect to the specific intent crimes and allegations, repeating in the case of each specific intent crime and allegation that intoxication was relevant to determining whether defendant had the requisite specific intent. The court then emphasized that its CALJIC No. 4.20 instruction applied only to the lesser related or lesser included offenses, which the court explained were general intent crimes. Moreover, as noted, the written instructions bore captions that helped to minimize juror confusion. We find no error.

e) *CALJIC Nos. 4.31 and 8.47*

 The trial court instructed the jury in accordance with: (1) CALJIC No. 4.31, which tells a jury to find a defendant was conscious if the evidence shows beyond a reasonable doubt that he *acted as if* conscious (unless the jury has a reasonable doubt that he was *in fact* conscious), and (2) CALJIC No. 8.47, which states that a killing done "while unconscious as a result of voluntary intoxication" and "without intent to kill [or] malice aforethought" is involuntary manslaughter. Defendant argues the trial court should have granted his request to define the term "unconscious" to make clear that a person can be legally unconscious and still able to move and perform actions. We rejected this argument in *People v. Clark* (1993) 5 Cal.4th 950, 1020 [22 Cal.Rptr.2d 689, 857 P.2d 1099], concluding that CALJIC Nos. 4.31 and 8.47 made this point sufficiently clear. Defendant distinguishes *People v. Clark* on the ground that, here, the trial court also instructed the jury in accordance with CALJIC No. 4.20. As noted, CALJIC No. 4.20 states that an act is not less criminal by reason of voluntary intoxication. Defendant does not explain how CALJIC No. 4.20 would have changed the jury's understanding of the term "unconscious" as used in CALJIC No. 8.47. Hence, the clarification defendant sought was no more necessary on account of the CALJIC No. 4.20 instruction, and our reasoning in *Clark* applies with equal force here. We find no error.

f) *CALJIC No. 8.81.17*

The trial court instructed the jury in accordance with the first paragraph of CALJIC No. 8.81.17, stating: "To find that the special circumstance referred to in these instructions as murder in the commission or attempted commission of robbery or burglary is true, it must be proved the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery or burglary." Defendant argues the court should also have instructed the jury (sua sponte) in accordance with the second paragraph of CALJIC No. 8.81.17, which would have told the jury that the prosecution needed to prove the murder was "in order to carry out or advance" the robbery, attempted robbery, or burglary "or to facilitate the escape therefrom or to avoid detection" and that if the robbery, attempted robbery, or burglary was "merely incidental" to the murder, the special circumstance was not established. (CALJIC No. 8.81.17 (6th ed. 1996).)

The second paragraph of CALJIC No. 8.81.17 is appropriate where the evidence suggests the defendant may have intended to murder his victim without having an independent intent to commit the felony that forms the basis of the special circumstance allegation. In other words, if the felony is merely incidental to achieving the murder—the murder being the defendant's primary purpose—then the special circumstance is not present, but if the defendant has an "independent felonious purpose" (such as burglary or robbery) and commits the murder to advance that independent purpose, the special circumstance is present. (*People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468]; see also *People v. Raley* (1992) 2 Cal.4th 870, 903 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Thompson* (1980) 27 Cal.3d 303, 323-324 [165 Cal.Rptr. 289, 611 P.2d 883].)

Here, the record includes no significant evidence of any motive for the murders other than burglary and/or robbery. Defendant asserts, based on "the multitude of stab wounds," that the killings might have been an explosive "unleashing of some type of unconscious hatred for women," having nothing to do with robbery or burglary. But the record does not include any evidence (other than the brutality of the crimes) that defendant had an unconscious hatred for women, and defendant did nothing to develop this theory of the case at trial, making only a passing speculative reference to this theory at closing argument. Defendant's primary defense at trial was that he was too intoxicated to act with intent. Under the circumstances of the case as presented to the jury, the second paragraph of CALJIC No. 8.81.17 was not required.

g) *Instruction that defendant need only raise a reasonable doubt*

Defendant asserts the trial court should have instructed the jury that, to overcome or negate proof of an element of a charged offense, he need only

raise a reasonable doubt as to foundational facts. The jury was so instructed, as follows: "[E]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. [¶] In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt."

### h) Combined effect of instructions

Based on combinations of several of the asserted instructional errors, defendant speculates about the various flawed legal conclusions the jury may have drawn. As stated, however, we find no instructional error, and therefore this speculation is baseless.

### 8. Prosecutor Did Not Commit Prejudicial Misconduct and/or Defendant Forfeited Misconduct Claims.

 Defendant asserts several instances of prosecutorial misconduct. "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so 'egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (People v. Samayoa (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

### a) Cross-examination of Elizabeth Gerencser

The prosecutor engaged in the following exchange with witness Elizabeth Gerencser:

"Q: Elizabeth, you're afraid right now, aren't you?

"A: Yes.

"Q: More afraid than the last time you came in here; is that correct?

"A: Yes.

"Q: Can you tell us why?

"A: [Defendant's] girlfriend. [¶] . . . [¶]

"Q: And you saw her out in the hallway?

"A: Right."

■■■■ Defendant argues the prosecutor created the false impression that defendant had threatened the witness. Defendant did not raise this specific objection in the trial court, and therefore he forfeited the issue. (*People v. Williams* (1997) 16 Cal.4th 153, 208-209 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Moreover, as the prosecutor explained at a bench conference, he had a right to inquire into matters relating to the witness's credibility, and therefore he appropriately elicited evidence that defendant's girlfriend, who had been sitting in the courtroom, made the witness afraid. (See, e.g., *People v. Carpenter* (1999) 21 Cal.4th 1016, 1054 [90 Cal.Rptr.2d 607, 988 P.2d 531].) In compliance with the court's order, the prosecutor did not press this issue further and did not suggest to the jury that defendant had threatened the witness. We find no misconduct.

b) *Suggestion of sexual assault*

■■■■ The information did not allege defendant sexually assaulted either murder victim. Defendant argues the prosecution nevertheless took advantage of several opportunities to suggest a sexual assault had occurred, thereby bringing up an issue that was irrelevant and highly inflammatory. First, defendant complains that the prosecutor elicited testimony to the effect that blood consistent with defendant's blood was "near the fly" of the jeans defendant left at Benny Garcia's house the day after the murders and that the button of the jeans, which police found in Hickman's apartment, "appeared to be ripped from its position." Defendant argues this testimony suggested to the jury that defendant had sexually assaulted Hickman. Defendant did not object to the testimony on this basis at trial, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, we reject defendant's argument on the merits. Using the word "fly" when describing a particular location on a pair of pants is not, in itself, sexually suggestive and does not, in this context, imply a sexual assault. As for the opinion testimony that the button was ripped from the jeans, the evidence was relevant to support the inference that the button came off in the course of a struggle with Hickman, explaining to some extent why it happened to be lying on the floor near Hickman's body.

Defendant next complains that, when his own counsel asked the medical examiner on cross-examination if there was any evidence of a sexual assault

of either victim, the examiner said: "There was no evidence to substantiate . . . that a *forceful* assault had occurred." (Italics added.) Defendant argues that, by qualifying the answer with the word "forceful," the witness implied a sexual assault may have occurred, but defendant does not explain how an answer to a question of his own counsel could amount to prosecutorial misconduct. We find no misconduct.

Defendant also asserts prosecutorial misconduct based on testimony that a "yellow foreign substance" was on one side of a shard of glass police investigators found in Hickman's bedroom. Defendant asserts the testimony led the jury to believe that the yellow substance was semen. Defendant did not object to this testimony at trial, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, defendant's characterization of the testimony as implying presence of semen has no merit. Deputy Sheriff Dale Falicon testified that he searched Hickman's apartment for fingerprints. He found defendant's palm print on a glass shard lying beneath the broken window and concluded that the print was on the inside of the window glass because the opposite side was dirtier and had water spots. In that context, Falicon testified that the dirty side of the glass had a dried yellow substance on it, as did the screen that police found lying outside the apartment on the ground. Neither the witness nor the prosecutor ever suggested this substance was semen, and the more natural inference was that it was something from the outside environment that had dirtied the window screen and the outside of the window before the window was broken.

Defendant further argues the prosecutor committed misconduct by eliciting the testimony that Hickman had stab wounds to the rectum area. Defendant did not object to this questioning at trial, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, we find no misconduct. Sergeant Charles Rosales testified as to the condition of Hickman's body when he found her. The prosecutor asked him to identify a photograph of Hickman's leg showing several stab wounds, and Sergeant Rosales said, "One of her legs," and then added without prompting, "There were approximately five stab wounds to the legs[,] to the rectum area." The prosecutor then proceeded with questioning about a different subject, and defendant later elicited testimony from the medical examiner, clarifying the location of Hickman's wounds. Furthermore, the medical examiner's report indicates that Hickman suffered a stab wound to the right buttock near the anus, as well as several to the back of her right thigh. When a crime involves a stab wound to the buttock near the anus, a defendant cannot complain if a police officer refers to the location of this wound as the "rectum area."

Defendant also reasserts his objection to the photographs of Converse's naked body, this time claiming prosecutorial misconduct in connection with

their use as evidence. He also complains about the testimony of prosecution witnesses who identified these photographs and described the condition of Converse's body when police found her. We also find no prosecutorial misconduct in the presentation of this evidence and the related testimony. When the victim of a murder has been stabbed directly between the breasts and left with her pants and underwear around her ankles, the defendant cannot complain of prosecutorial misconduct based on the presentation of evidence accurately depicting and describing the victim's nudity.

Defendant next complains that the prosecutor, during redirect examination of the medical examiner, elicited the testimony that the absence of trauma to the genital organs of the murder victims did not necessarily exclude the possibility of sexual assault, "because often no such trauma is caused during a rape or sexual assault." Defendant did not object to this line of questioning at trial, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, defense counsel was the one who first raised the issue of sexual assault, cross-examining the witness at length about his efforts to obtain sexual assault evidence and eliciting that the witness had found no "evidence to substantiate, from bruises and lacerations to the vagina, that a forceful assault had occurred." The prosecution could have objected to this line of questioning on relevancy grounds, but he did not, and we express no opinion as to whether such an objection would have been valid. Nevertheless, once defendant placed before the jury testimonial evidence that no sexual assaults had occurred, the prosecutor was entitled to obtain the clarification that the medical examiner's findings did not rule out the possibility of sexual assault. The prosecutor's inquiry was limited to clarifying what factual conclusions the jury could reasonably draw from testimony defendant had elicited on cross-examination. In those circumstances, his questioning was not error. (*People v. Steele* (2002) 27 Cal.4th 1230, 1247-1249 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

Finally, defendant complains about the prosecutor's statements during closing argument that Converse was "tied up, like an animal" and "stripped, for some—for some reason." Defendant forfeited this issue by not objecting at trial to the prosecutor's argument. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) In addition, we find no misconduct. The prosecutor made these statements to describe the ways in which the stabbing of Converse "shows a careful thought process." The fact that Converse was immobilized and "stripped" (that is, her pants and underwear were pulled down to her ankles) was relevant to show the mental state of her killer. Moreover, the prosecutor stopped himself before speculating as to why Converse's pants and underwear had been removed.

c) *Interpretation of defendant's demeanor*

Brigette Morales testified on cross-examination that, when she saw defendant on the morning after the murder, he looked like someone who was in the late stages of cocaine intoxication. More specifically, she said that he was paranoid, shaking, and licking his lips. The prosecution then on redirect examination tried to elicit her admission that a similar demeanor and conduct might be associated with fearing apprehension by the police after having just committed two murders, and therefore that cocaine may not have been the cause of defendant's condition. The trial court did not permit Morales to testify as to the former point, but she did admit that something other than cocaine could have caused defendant's demeanor and conduct. Defendant argues this line of questioning was misconduct because the prosecutor was "attempt[ing] to sway the jury by interjecting his personal beliefs, opinions and experiences as a prosecutor." Defendant did not object on this basis in the trial court, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, defendant's characterization of the questioning is incorrect. The prosecutor was simply asking Morales whether she had considered all the possible explanations for the demeanor and conduct she observed, and in that way, he was casting permissible doubt on her lay opinion that defendant was suffering from the effects of cocaine.

Defendant also complains about the prosecutor's assertion in closing argument that defendant was "act[ing] like a murderer" on the morning after the murders. The prosecutor argued: "First of all he's behaving like a man running away. Running away, in this case, from murder." Later, with reference to Morales's opinion that defendant was in the late stages of cocaine intoxication on the morning after the murders, he argued: "But, when you ask her about it, those same things that made her think that[, they] are the same symptoms, the same signs someone would exhibit who had just murdered, brutally murdered two women and was trying to get away." Defendant did not object to this argument at trial, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, we find no misconduct. The prosecution is entitled to argue that the evidence supports its theory of the case rather than defendant's theory. (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

d) *Testimony of Sergeant Charles Rosales*

Defendant asserts several instances of prosecutorial misconduct based on the testimony of Sergeant Charles Rosales, which defendant characterizes as "emotional, graphic and highly inflammatory." Among other things, defendant reasserts his objection to Sergeant Rosales's statement that "in 22 years

of police work" he had "never seen anybody stabbed this many times." As already noted, the court struck this statement from the record and admonished the jury to disregard it. As to defendant's other claims of misconduct in connection with Sergeant Rosales's testimony, defendant did not raise his objections in the trial court, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, we find no prosecutorial misconduct.

Specifically, defendant asserts misconduct based on Sergeant Rosales's testimony that the knife wounds on Hickman's body were too many to count. Defendant suggests that the prosecutor was eliciting inflammatory responses to his questions. The evidence, however, indicates that Hickman was stabbed nearly 50 times. Under those circumstances, defendant cannot complain that a police witness describes the wounds as being too many to count.

Defendant also complains that the prosecutor elicited testimony from Sergeant Rosales about the amount of blood at the crime scene and also about indications of a struggle. The circumstances of the murder were relevant to the issue of intent. The spatters of blood all over the room and other signs of a prolonged struggle suggested a violent attack that was consistent with the prosecution's theory of the case. We see no misconduct.

Defendant next complains that Sergeant Rosales's testimony referring to various parts of Hickman's body suggested defendant had dismembered Hickman. Sergeant Rosales merely identified what parts of Hickman's body appeared in various photographs. The jury could easily see from the photographs that Hickman was not dismembered.

Defendant also argues that Sergeant Rosales was not an expert qualified to testify that certain wounds were inflicted after the victim was either dead or had lost a tremendous amount of blood. We believe the prosecution laid sufficient foundation for this testimony by eliciting from Sergeant Rosales that he had observed knife wounds on other occasions and was familiar with the amount of blood loss one would expect from a knife wound. In any case, as noted, defendant did not raise this objection at trial and therefore forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.)

Finally, defendant reasserts misconduct based on Sergeant Rosales's testimony that Hickman had stab wounds "to the legs[,] to the rectum area." For the reasons already discussed, we find no misconduct in connection with this testimony.

### e) *Cross-examination of Ernest Ramos*

 Defendant next asserts prosecutorial misconduct based on the cross-examination of defense witness Ernest Ramos. On direct examination, defense counsel asked Ramos whether, when Ramos last saw defendant at 11:30 p.m. on the night of the murders, defendant looked as if he had been smoking "rock," meaning cocaine. Ramos answered no, but when the question was repeated he answered yes. During cross-examination, the prosecution pointed out this equivocation and asked: "You don't want to just give the answers that he wants, do you?" Defendant asserts this question constituted misconduct because it suggested, without foundation, the witness had lied to protect defendant. Defendant did not object to this question in the trial court, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, any misconduct associated with this question could not have prejudiced defendant. The question called into doubt Ramos's testimony that shortly before the murders defendant looked as if he had smoked cocaine. But even if the jury improperly discredited Ramos's testimony on this point, it is not "reasonably probable that a result more favorable [to defendant] would have been reached" in the absence of this error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In addition to Ramos's testimony, defendant presented significant other evidence of his intoxication during the evening before the murders, but the jury nevertheless rejected his intoxication defense.

The prosecutor also asked Ramos whether defendant sold a videocassette recorder during the day before the murders in order to purchase cocaine. The prosecutor repeated the question and also asked what defendant had said to Ramos's brother. Ramos answered in each case that he did not know. Later, the prosecutor asked Ramos whether defendant had told him on the day before the murders that Converse had guns in her apartment, to which Ramos answered no, and whether guns could be easily traded for cocaine, to which Ramos answered yes. Defendant argues that this questioning was misconduct because the prosecutor had no evidentiary basis for the questions and the questions planted in the minds of the jurors the unsubstantiated idea that defendant sold Converse's videocassette recorder in order to buy cocaine and then later reentered her apartment in order to steal her rifles and trade them for more cocaine.

We find no misconduct. Defendant had previously elicited Ramos's testimony that rock cocaine was sold in the alley behind defendant's apartment complex. The prosecutor was entitled, under the circumstances, to inquire further into this matter. (See, e.g., *People v. Steele, supra,* 27 Cal.4th at pp. 1247-1249; *People v. Clark, supra,* 5 Cal.4th at p. 1016.)

f) *Closing argument regarding defendant's intoxication*

 Defendant claims the prosecutor committed misconduct by arguing to the jury that intoxication was irrelevant unless it rose to the level of unconsciousness. The prosecutor made no such argument.

As noted, the trial court instructed the jury in accordance with CALJIC No. 8.47 to the effect that a killing done "while unconscious as a result of voluntary intoxication" and "without intent to kill [or] malice aforethought" is involuntary manslaughter. The prosecutor explained this instruction to the jury as follows: "When we're talking about drunkenness—being drunk or being under the influence of drugs as it relates to murder, *for it to be involuntarily murder*, for it to go down that low, the jury instructions . . . state that the level has to be one of unconsciousness." (Italics added.) The prosecutor's comments about unconsciousness were clearly directed to the lesser included offense of involuntary manslaughter. The prosecutor did not tell the jury that intoxication was otherwise irrelevant, and in any case, the court instructed the jury that, as to robbery, burglary, murder, and the great bodily injury allegation, it "should consider [intoxication] in determining whether defendant had [the requisite] specific intent."

Defendant also faults the prosecutor for stressing throughout his argument that defendant acted as if conscious. Defendant did not object to this argument at trial, and therefore he forfeited the issue. (*People v. Dennis* (1998) 17 Cal.4th 468, 521-522 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, the prosecutor merely argued that defendant's actions showed intent and planning. The prosecutor was entitled to assert his interpretation of what the evidence showed. We find no prosecutorial misconduct.

9. *Cumulative Error.*

Defendant argues that, even if no single error warrants reversal of the judgment, the cumulative effect of all the errors necessitates reversal. We have found no prejudicial error, and therefore defendant's argument is without merit.

C. *Penalty Phase Issues*

1. *Prosecutor Did Not Commit Misconduct.*

a) *Spillover effect from guilt phase prosecutorial misconduct*

 At defendant's request, the trial court instructed the jury to consider the evidence from the guilt phase in making its penalty phase decision.

Citing that instruction, defendant reasserts several alleged instances of guilt phase prosecutorial misconduct as a basis for reversing the penalty verdict. Specifically, defendant repeats his assertions that the prosecutor improperly argued (or insinuated) that: (1) defendant had threatened Elizabeth Gerencser, (2) defendant had sexually assaulted the murder victims, (3) defendant's demeanor and conduct the morning after the murders could have been the result of his having committed the murders, and (4) defendant stole Converse's videocassette recorder and rifles to obtain money for drugs. Defendant's claims of prejudice at the penalty phase all depend on his assertion that the prosecutor committed the guilt phase misconduct defendant alleges, but we have already rejected these contentions, finding defendant forfeited his claims of prosecutorial misconduct and/or that no prejudicial misconduct occurred. Furthermore, the guilt phase evidence the prosecutor elicited in each of these instances, which *at defendant's request* became a part of the penalty phase deliberations, was relevant at the penalty phase to show (1) the nature and circumstances of defendant's crimes, (2) his character, and/or (3) his level of intoxication at the time of the crimes. (See § 190.3.) Because all this evidence was relevant to issues properly before the jury, we have no basis to credit defendant's speculative claim that the evidence somehow caused the jury to base its penalty verdict on nonstatutory aggravating factors.

### b) *Victim-impact questioning*

■ Defendant's mother, Lupe Gallegos, testified about defendant's difficult childhood. She also described her belief that the death of her first child and defendant's birth defect (a tumor on his neck) were God's punishment "for [her] having children out of wedlock." Gallegos related that defendant had surgery for the tumor. Before the surgery, she had a priest baptize him, and she promised "Blessed Martin de Porres" that if defendant survived the surgery, she would dress him in a white outfit and take him to church every Sunday for a year.

On cross-examination, the prosecutor asked Gallegos about the strong emotions she felt as a parent of someone who might die for his crimes. He then asked if she had thought about how the parents of the murder victims feel, and Gallegos answered that she had prayed for them. The prosecutor also questioned Gallegos about her belief that losses in her life were God's will, and he asked: "You think it might be God's will that [defendant] pay for what he's done?" Defendant objected before Gallegos could answer, but the objection was not directed to the questions about "God's will"; rather, it was directed to the prosecutor's previous question about the feelings of the victims' parents. The objection asserted that the prosecutor was eliciting

inadmissible victim-impact evidence. The court agreed the questioning was improper under *Booth v. Maryland* (1987) 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440], but rejected defendant's request for a mistrial. Instead, the court struck the question and the testimony "relative to the impact on the victim's family" and admonished the jury not to consider during deliberations the impact of defendant's crimes on the victim's families. Defendant now asserts prosecutorial misconduct based on inappropriate victim-impact questioning, and he claims the trial court erred in failing to grant a mistrial.

Defendant's argument is without legal basis because the high court largely overruled *Booth v. Maryland, supra,* 482 U.S. 496, in *Payne v. Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720], and under California law, a court may permit victim-impact evidence and argument in appropriate cases at the penalty phase of a capital trial to show the circumstances of the crime. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Moreover, the prosecutor did not actually present victim-impact evidence. Rather, he asked defendant's mother if she had considered the feelings of the victims' families, which was relevant to help the jury evaluate the sincerity of the strong emotions she displayed while testifying.

Defendant also argues the prosecutor, by asking Gallegos whether she thought it was God's will that defendant "pay for what he's done," improperly appealed to religious authority as support for the death penalty. Defendant did not raise this objection at trial, and therefore he forfeited the issue. (*People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, defendant brought into issue Gallegos's religious beliefs, eliciting during direct examination that she believed the death of her first child and defendant's tumor were God's will. If she would resign herself to the jury's verdict in the same way, then the jury might conclude that the impact of the verdict on her would be slight. At the time of defendant's trial, the law was unsettled as to the admissibility of evidence showing the impact a death verdict would have on the defendant's family. (*People v. Ochoa, supra,* 19 Cal.4th at p. 455.) Because defendant raised the issue of Gallegos's religious beliefs as they pertained to the impact a death verdict would have on her, the prosecutor was entitled under the law as it then stood to inquire further into those questions. Though the prosecutor's specific question was clearly argumentative and, by implying that religious authority supported imposition of the death penalty, went beyond the bounds of what was appropriate (*People v. Sandoval* (1992) 4 Cal.4th 155, 193-194 [14 Cal.Rptr.2d 342, 841 P.2d 862]), "we find no reasonable possibility that the jury would have reached [a] more favorable verdict[] had the misconduct not occurred." (*Id.* at p. 194.)

### c) *Statement and argument about defendant's demeanor*

Immediately after the prosecutor asked defendant's mother if she thought "it might be God's will that [defendant] pay for what he's done," defendant made a gesture, and the prosecutor said: "Your honor, for the record, the defendant pointed his finger at me and mouthed some words. [¶] I'd like the record to reflect that. [¶] His face was angry." The court agreed and later urged defense counsel to speak to his client so the court would not need "to impose any further . . . restrictions on behavior." At closing argument, the prosecutor argued that defendant's demeanor during the course of trial, and especially the gesture just discussed, weighed in favor of the death penalty. Defendant argues the prosecutor's reference to the gesture during trial and again during closing argument constituted misconduct. Specifically, defendant asserts that the record does not reflect the specifics of defendant's gesture or demeanor, and therefore the prosecutor invited the jury to make its decision based on speculation.

Defendant did not raise this objection at trial and therefore forfeited the issue. (*People v. Dennis, supra,* 17 Cal.4th at pp. 521-522; *People v. Williams, supra,* 16 Cal.4th at pp. 208-209.) Moreover, a defendant's demeanor at trial—which, like the demeanor of witnesses, is rarely reflected in the record—is relevant at sentencing. (*People v. Williams, supra,* 44 Cal.3d at pp. 971-972.) In addition, a prosecutor may comment during closing argument on a defendant's demeanor. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1023 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Beardslee* (1991) 53 Cal.3d 68, 113-114 [279 Cal.Rptr. 276, 806 P.2d 1311].) We find no misconduct.

### d) *Cross-examination of Sandra Farfan regarding break-in*

Defendant's sister, Sandra Farfan, testified about her upbringing with defendant. On cross-examination, the prosecutor focused on her credibility, asking generally about her efforts to conceal defendant's crimes and get him out of trouble. Then he asked her about a break-in at her next-door neighbor's house, which allegedly occurred just a few weeks before the Converse and Hickman murders. Farfan answered that she was not home that weekend but had heard about it, and the prosecutor asked: "Somebody broke in and attacked her?" Farfan did not answer because of defendant's objection. At a sidebar conference, the prosecutor asserted that defendant had broken into Farfan's neighbor's house, and that he (the prosecutor) was trying to elicit from Farfan whether she had done anything to "cover it up."

The court agreed the questioning might be relevant to the issue of the credibility, and allowed the prosecutor to question the witness outside the

presence of the jury. Farfan then stated that she had heard about the incident from her children but did not know whether defendant was involved. The court decided, that without any evidence in the record of defendant's involvement in the break-in, the questioning of Farfan lacked foundation. The court denied defendant's mistrial motion but admonished the jury as follows: "[A] subject came up before I excused you about some other activities with some other named woman. [¶] I'm going to make a ruling at this time that whatever information came to your attention while you were here before, you are to disregard it completely. [¶] It isn't germane or relevant to this lawsuit."

Defendant challenges the trial court's ruling on his mistrial motion, asserting that the prosecutor's questioning with respect to this break-in constituted misconduct. On account of defendant's objection and the court's ruling, the prosecutor's questioning did not go further than confirming that Farfan had heard about the break-in, and asking if the person who broke in had attacked the neighbor. In proceedings before the jury, the prosecutor did not connect defendant with the incident, and the court later admonished the jury to disregard the testimony about the incident. Therefore, if the prosecutor's questioning of Farfan was improper, it was not prejudicial. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) Defendant argues the court's admonishment to the jury to disregard the questioning was ambiguous. We find the admonishment sufficiently clear; a more specific statement would have only drawn the jury's attention to the testimony, perhaps reinforcing it in the jurors' minds.

### e) *Inquiry about defendant's incarceration*

Defendant's live-in girlfriend, Maria Valles, testified that defendant was acting "paranoid and nervous" during the weeks prior to the murders and later stated on cross-examination that she "found out" defendant was using cocaine during that period. In order to impeach her testimony, the prosecutor tried to elicit that defendant was incarcerated from December 3, 1989, to December 5, 1989—the days immediately preceding the murders— and therefore could not have been doing cocaine at least on those days. Defendant objected, arguing that the risk of undue prejudice outweighed the probative value of the evidence (Evid. Code, § 352), and the court ruled that the prosecutor could only elicit that Valles had not seen defendant during those two days. Therefore, Valles did not testify to defendant's incarceration immediately preceding the murders.

Defendant argues this line of questioning constituted misconduct, but defense counsel, in his own questioning of Valles, had readily acknowledged

that defendant "was in jail a lot from the drugs," and Valles had already admitted that defendant was incarcerated in 1986 and 1987. Therefore, testimony about defendant's incarceration from December 3, 1989, to December 5, 1989, would not significantly have altered the picture the jury had of defendant. On the other hand, the prosecutor was entitled to cross-examine Valles about the factual basis for her assertion that defendant was using cocaine during the days and weeks leading up to the murders. Moreover, on account of the court's ruling, the jury did not hear of defendant's incarceration during the days immediately before the murders. Accordingly, we find no misconduct and no possibility of prejudice to defendant.

### f) *Closing argument*

Defendant raises several objections to the prosecutor's closing argument. He did not raise any of these objections at trial, and therefore he forfeited them. (*People v. Dennis, supra*, 17 Cal.4th at pp. 521-522.) Moreover, the objections lack merit. Defendant claims misconduct based on the prosecution's description of the murders as "brutal almost beyond imagination," his assertion that "nothing . . . could even come close to showing the true horror of these acts," and his statement that the crime scene photographs "pale in comparison" to what defendant did. Defendant also asserts misconduct based on the prosecutor's comment that Sergeant Rosales, "a tall, strong man [¶] . . . [who] ha[d] seen it all," lost his composure while testifying about the murder scene. These statements all fall within the scope of appropriate argument in a case with facts like those presented here. (*People v. Lucero* (2000) 23 Cal.4th 692, 722-723 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Osband* (1996) 13 Cal.4th 622, 703 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *Medina, supra*, 11 Cal.4th at pp. 777-778.)

Defendant asserts that the prosecutor improperly reaffirmed Sergeant Rosales's stricken testimony that "in 22 years of police work [he had] never seen anybody stabbed [so] many times." The prosecutor merely argued that Sergeant Rosales's demeanor as one who "ha[d] seen it all" made him a credible witness, thereby underscoring the seriousness of the crimes. This argument was not improper. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756].) The prosecutor did not mention Sergeant Rosales's stricken testimony, nor did he vouch for the accuracy of Rosales's testimony.

Defendant further complains that, by referring to "what [defendant is] capable of doing," the prosecutor argued defendant's future dangerousness as a nonstatutory factor weighing in favor of the death penalty. Assertions about a defendant's future dangerousness at closing argument are permissible if supported by the evidence and not based on expert opinion. (*People*

*v. Ervin* (2000) 22 Cal.4th 48, 99 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Here, the evidence amply supported the prosecutor's brief comment.

 Defendant next contends the prosecutor improperly argued that defendant was guilty of sex crimes against the murder victims, by arguing that the nude body of Deborah Converse pressed against defendant as he stabbed her and then reminding the jury of defendant's assault on Frances C. When arguing in favor of the death penalty, a prosecutor is entitled to discuss the circumstances of the defendant's crime. (§ 190.3; *People v. Dennis, supra,* 17 Cal.4th at p. 549.) Here, where the circumstances of the murders possibly suggested some sexual conduct or motivation (particularly in light of defendant's criminal history), the prosecutor could point out that fact despite the absence of specific sex-crime charges.

 Defendant objects that the prosecutor argued defendant's lack of remorse as a nonstatutory factor weighing in favor of the death penalty. Defendant also argues the prosecutor committed misconduct when he told the jury to show defendant the same amount of sympathy, mercy, or pity that defendant showed his victims. More specifically, the prosecutor asked the jury: "What remorse has [defendant] ever shown?" He also reminded the jury that defendant's courtroom demeanor included "icy cold stares" and showed "[n]o sorrow. [¶] No feeling. [¶] No morals. [¶] And above all else, no conscience." This argument, however, was in the context of responding to defendant's plea for pity and sympathy. In making it, the prosecutor did not suggest that lack of remorse was an aggravating factor warranting the death penalty. Accordingly, the argument was not improper. (*People v. Lewis, supra,* 25 Cal.4th at pp. 673-674.)

Defendant also objects to the prosecutor's argument that defendant engaged in "a rejoicing celebration of a murder" and "brag[ged] about his new property." The evidence indicates that defendant called his girlfriend during the time between the two murders and asked her if she wanted to ride in his truck—the one he had just stolen from his first murder victim. While the prosecutor's characterization of this telephone conversation as a "rejoicing celebration" and "brag[ging]" was a hyperbole, we do not think it was misleading to the jury, and it falls within the scope of permissible argument. (Cf. *People v. Carrera* (1989) 49 Cal.3d 291, 320 [261 Cal.Rptr. 348, 777 P.2d 121].)

Defendant next asserts misconduct based on the prosecutor's argument that defendant stabbed the murder victims "long after they had already been dead." Defendant objects to the prosecutor's use of the word "long," asserting that the stab wounds were all inflicted at roughly the same time. He also

argues that, assuming some of the wounds were inflicted postmortem, no evidence suggests defendant knew the victims were dead when he inflicted these wounds. We find no misconduct. "Long" is a relative term; a few seconds might be characterized as a long time when a murderer continues to stab a victim who shows no signs of life. The jury in this case could infer from the evidence—and in particular from the number of stab wounds—that the killer continued to stab the victims long after they died. Though a different conclusion was also possible, the prosecutor was entitled to make reasonable inferences based on the evidence, and defendant was entitled to assert contrary inferences. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1027.)

Finally, defendant claims prosecutorial misconduct based on the prosecutor's invitation to the jury to imagine what Deborah Converse must have seen, thought, and said just before she died, suggesting she may have "beg[ged] for her life." Again, we find no misconduct. One can reasonably infer that an innocent murder victim will feel fear and plead with the killer to stop. As discussed, a prosecutor may, in the course of closing argument, make reasonable inferences about the circumstances of the crime and may invite the jury to do the same. (*People v. Dennis, supra*, 17 Cal.4th at p. 549; *Medina, supra*, 11 Cal.4th at pp. 777-778.)

g) *Cumulative effect*

Defendant argues the cumulative effect of the prosecutorial misconduct at the guilt and penalty phases requires reversal of penalty judgment. We have found no prejudicial misconduct and/or that defendant forfeited his claims of misconduct, and we reject the argument on that basis.

2. *Trial Court Correctly Instructed the Jury.*

a) *Proof of aggravating factors*

Defendant argues the trial court should have instructed the jury that the prosecution needed to prove beyond a reasonable doubt (1) the existence of any aggravating factors, (2) that the aggravating factors outweighed the mitigating factors, and (3) that death was the appropriate penalty. Defendant also claims that the failure to state any standard of proof with respect to aggravating factors constituted an independent constitutional error. Defendant claims ineffective assistance of counsel based on his attorney's failure to request instructions along these lines. We have repeatedly rejected these contentions and do so again here. (See, e.g., *People v. Box, supra*, 23 Cal.4th at p. 1216, and cases cited therein.) The high court's decision in *Ring v.*

*Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] does not require us to reach a different conclusion, because *"Ring* does not apply to California's penalty phase proceedings." (*People v. Prieto* (2003) 30 Cal.4th 226, 272 [133 Cal.Rptr.2d 18, 66 P.3d 1123] (*Prieto*).)

### b) *Adverse inference from failure to testify*

Defendant argues the trial court should have instructed the jury sua sponte not to draw any adverse inference from the fact that defendant did not testify. Defendant points out that the court gave an instruction of this kind at the guilt phase, but it instructed the jury at the penalty phase to disregard guilt phase instructions. On this basis, defendant asserts the jury may have thought it was appropriate at the penalty phase to draw an adverse inference from defendant's failure to testify. We have repeatedly rejected similar contentions (see, e.g., *People v. Holt* (1997) 15 Cal.4th 619, 687 [63 Cal.Rptr.2d 782, 937 P.2d 213]), and do so again here. Defense counsel may have a tactical reason for not wanting the instruction defendant proposes— particularly at the penalty phase—and the court does not err in failing to give the instruction sua sponte.

### c) *Agreement as to aggravating factors*

Defendant argues the trial court should have instructed the jury that it had to reach a unanimous agreement as to the existence of a particular aggravating factor before it could take that aggravating factor into consideration. We have held that this instruction is not necessary in light of other instructions that ensure reliability of the death verdict. (See, e.g., *Prieto, supra,* 30 Cal.4th at p. 275; *People v. Coddington* (2000) 23 Cal.4th 529, 641-642 [97 Cal.Rptr.2d 528, 2 P.3d 1081].)

### d) *Meaning of life without the possibility of parole*

Defendant asserts error based on the trial court's refusal to give his requested instruction that "[l]ife without the possibility of parole *means* life without the possibility of parole." We have repeatedly rejected a similar contention (see, e.g., *People v. Memro* (1995) 11 Cal.4th 786, 886-887 [47 Cal.Rptr.2d 219, 905 P.2d 1305]), and do so again here. Among other things, the proposed instruction is confusing because its internal circularity might have caused the jury to speculate that other instructions do *not* mean what they say.

### e) *Conclusion*

We find no instructional error at the penalty phase and no ineffective assistance of counsel.

### 3. California's Death Penalty Law Is Constitutional.

Defendant asserts that the statutory scheme governing the death penalty in California is unconstitutional on several grounds. We have repeatedly rejected similar contentions and do so again here. Specifically, the death penalty law is constitutional despite defendant's contentions that it: (1) fails to require the jury to make specific written findings as to aggravating and mitigating factors (see, e.g., *Prieto, supra,* 30 Cal.4th at p. 275; *People v. Lewis, supra,* 25 Cal.4th at p. 677); (2) gives individual prosecutors unfettered discretion to decide in which special circumstance cases to seek the death penalty (see, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 601-602 [106 Cal.Rptr.2d 575, 22 P.3d 347]); (3) does not provide for intercase and intracase proportionality review (see, e.g., *Anderson,* at p. 602); (4) fails in general to narrow the class of offenders eligible for the death penalty and fails to do so specifically with respect to the multiple-murder special circumstance (see, e.g., *People v. Burgener* (2003) 29 Cal.4th 833, 884, fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Lucero, supra,* 23 Cal.4th at p. 740); (5) is unclear in its definition of aggravating and mitigating circumstances, particularly in the absence of clarifying jury instructions that, among other things, identify inapplicable mitigating circumstances (see, e.g., *Anderson,* at p. 601; *People v. Ayala, supra,* 23 Cal.4th at p. 303); (6) permits, under factor (b) of section 190.3, reliance on evidence of unadjudicated criminal activity such as defendant's use of illegal drugs (*Lewis,* at p. 676); and (7) employs restrictive terminology, such as the word "extreme" in factor (d) of section 190.3, that prevents consideration of certain mitigating factors. (See, e.g., *Anderson,* at p. 601.)

 Assuming defendant's argument on appeal constitutes a request that we now conduct intracase proportionality review pursuant to the California Constitution (see, e.g., *People v. Anderson, supra,* 25 Cal.4th at p. 602), we find no basis to overturn the judgment of death. The evidence indicates defendant robbed and murdered two women in their homes in the middle of the night, stabbing one of the women nearly 50 times. He then battered and robbed a third woman, inflicting serious bodily injury. We conclude that the death penalty is not grossly disproportionate to defendant's personal culpability.

### 4. Impermissible Racial Factors Did Not Affect the Proceeding.

Defendant argues that impermissible racial factors influenced the prosecutor's decision to seek the death penalty, the conduct of the trial, and the jury's verdict. Defendant bases this argument on the following facts: (1) he is a young Hispanic man and the murder victims were young, unmarried

White women, (2) the court instructed the jury to take the circumstances of the crime into consideration in deciding the penalty, and (3) there was only one Hispanic person on the jury. These facts are insufficient to support defendant's claim. (See, e.g., *People v. Lewis, supra,* 25 Cal.4th at p. 677.)

### 5. *Cumulative Error.*

Defendant argues that the cumulative and interrelated effect of the guilt and penalty phase errors requires reversal of the penalty verdict. We have found no prejudicial error, and therefore defendant's argument is without merit.

### D. *Postverdict Issues*

#### 1. *Trial Court Did Not Err in Denying Application for Modification of the Verdict.*

Pursuant to section 190.4, subdivision (e), the trial court conducted an independent review of the evidence, guided by the aggravating and mitigating circumstances listed in section 190.3. Defendant asserts the trial court committed a number of errors in this regard.

##### a) *Disparate sentence review*

Defendant argues that disparate sentence review under section 1170 should apply in capital cases and that the trial court erred in failing to conduct such a review. We have repeatedly rejected this argument. (See, e.g., *People v. Crittenden, supra,* 9 Cal.4th at p. 157.)

##### b) *Weight given to aggravating and mitigating factors*

Defendant complains the trial court did not give sufficient weight to his intoxication at the time of his offenses and the particularly adverse effect drugs and alcohol had on his behavior. (§ 190.3, factor (h).) The trial court stated in this regard: "I don't find any significant evidence of mental disease or defect in this case due to intoxication. And I am prepared to accept the fact that there was evidence of intoxication. But I don't believe it was sufficient evidence to mitigate. As I have indicated previously he evidenced a knowing design to take human life and a continuing disregard for it." This statement represents a reasonable assessment of the evidence. Though some evidence indicated that defendant became intoxicated during the day and evening prior to the murders, other evidence, including his careful efforts to clean and conceal the murder weapon and his telephone call to his girlfriend

at the approximate time of the murders, indicated defendant was able to function without significant impairment. We find no error.

 Defendant next complains the trial court did not give sufficient weight to the tragic circumstances of his birth and childhood, his ongoing struggles with drug and alcohol addiction, and his good character when sober. (§ 190.3, factor (k).) The trial court stated that it had "paid particular attention" to evidence of defendant's "life history." The court concluded: "I am not persuaded, after hearing the evidence, that his unfortunate childhood can be an acceptable kind of wellspring from which we can accept this kind of conduct or this kind of behavior. [¶] What I have observed is conscious indifference to human life. And I have observed no true remorse during the course of these proceedings . . . ." This statement shows that the court weighed the mitigating evidence and gave it the weight it deemed appropriate in light of defendant's crimes. We find no error.

Defendant further argues that the trial court did not give sufficient weight to his young age and extreme mental or emotional disturbance at the time of his offenses. (§ 190.3, factors (d), (i).) The court expressly took defendant's age into consideration but found it not mitigating in comparison to the circumstances of defendant's crimes. Defendant was 24 when he committed these crimes, and he had substantial prior experience with the criminal justice system. The evidence does not suggest he lacked the maturity or sophistication necessary to appreciate the significance of his actions. The court also took the possibility of mental or emotional disturbance into consideration but found no evidence defendant had a disturbance "other than the pressing need to satisfy whatever his own personal needs were." On appeal, defendant cites no evidence of mental or emotional disturbance, implying that defendant's personal history and the crimes themselves are sufficient to establish such a disturbance. They are not.

Finally, defendant argues the trial court gave too much weight in aggravation to the circumstances of defendant's crimes. Defendant complains that the court characterized the crimes as a "blood bath," "callous and inhumane," and "uncommonly cruel," and added that defendant was "remorseless" on the night of the crimes and "had abandoned any sense of morality." All these characterizations accurately describe the evidence and were appropriate considerations under section 190.3, factor (a). We find no error.

c) *Asserted use of improper aggravating factors*

Defendant argues that the trial court used his age as a factor in aggravation, thereby improperly using a mitigating factor as an aggravating factor.

Defendant misreads the record. The court expressly described defendant's age as a "mitigating factor" and found it did not outweigh the aggravating factors, alone or in combination with other mitigating factors.

Defendant also argues the trial court improperly considered defendant's lack of remorse as an aggravating factor, basing this claim on the court's comment that defendant had shown "no true remorse" during the trial proceedings. The court's comment was in the context of considering defendant's life history as a mitigating factor. The court noted that defendant had not shown remorse, and therefore remorse was not a relevant mitigating factor. The court's comment does not suggest it considered defendant's lack of remorse to be an aggravating factor. (*People v. Ochoa, supra,* 19 Cal.4th at pp. 461-462.)

■ Defendant next contends the trial court used defendant's failure to testify as a factor in aggravation. It did not. The prosecutor argued that defendant had not offered any explanation or excuse for his actions, but the court did not adopt this argument in making its findings, nor does the argument necessarily refer specifically to defendant's failure to testify.

Finally, defendant argues the court improperly weighed each mitigating circumstance individually against the aggravating circumstances instead of weighing the totality of mitigating circumstances against the aggravating circumstances. Certain of the court's comments, taken out of context, support defendant's argument. For example, in discussing defendant's age, the court stated: "I don't find his age to be a mitigating factor *in comparison to the facts and circumstances of the case.*" Nevertheless, looking at the court's comments as a whole, we conclude the court considered the mitigating factors cumulatively, though it took the facts of the case into account when evaluating what weight to give any individual mitigating factor.

d) *Standard of review*

■ Defendant argues the trial court improperly employed a deferential standard rather than an independent judgment standard when reviewing the verdict. The court described the standard it was applying in words that closely paraphrased the text of section 190.4, subdivision (e), as well as our decisions interpreting that statute. The court made clear that it was making an "independent evaluation" and an "independent determination." We see no error in the court's discussion of the applicable standard. Defendant complains that the court exhibited undue deference to the jury by stating that the

jury had not acted "unreasonably, irrationally, or with any conceived passion or zeal" and that the jury's finding on a particular point was not "unreasonable." But the court also expressly stated that it was making its findings independently. The court did not err by supplementing its findings with the comment that the jury had acted reasonably.

### e) *Asserted reliance on matters not before the jury*

Defendant points out that the trial court read the probation report (and by implication the letters attached to that report) prior to hearing argument and ruling on defendant's application for modification of the verdict, and he asserts error on this basis. In ruling on an application for modification of the verdict, the trial court may only rely on evidence that was before the jury. (See, e.g., *People v. Mendoza, supra,* 24 Cal.4th at p. 198.) Therefore, the better procedure is to rule on the application for modification before reading the probation report. (*People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) Here, however, the court considered the application for modification on the same day as the sentencing hearing, and in preparation for the sentencing, the court read the probation report. Nevertheless, nothing in the record suggests the court considered or relied on the probation report or attached materials when ruling on the application for modification. We find no error. (*People v. Dennis, supra,* 17 Cal.4th at p. 551.)

### f) *Cumulative effect*

Defendant argues the cumulative effect of the trial court's errors with respect to the application for modification of the verdict requires reversal. We have found no error, and therefore defendant's argument is without merit.

### 2. *Trial Court Did Not Err in Denying Motion for a New Trial.*

Defendant argues the trial court should have granted his motion for a new trial, which he based on insufficiency of the evidence and juror bias. We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard. (*People v. Davis* (1995) 10 Cal.4th 463, 524 [41 Cal.Rptr.2d 826, 896 P.2d 119].) In challenging the trial court's ruling, defendant merely incorporates by reference arguments appearing in other places in his appellate brief. Specifically, he asserts (1) his intoxication

at the time of his crimes prevented him from forming the specific intent or other mental state necessary to establish his guilt, and (2) concerns jurors expressed about their safety establish their bias against him. We have already rejected these arguments, and do so again in the present context.

### III. CONCLUSION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 9, 2003. George, C. J., and Brown, J., did not participate therein.