Filed 4/6/26  P. v. Smith CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TYLER SMITH,<br><br>Defendant and Appellant. | C100959<br><br>(Super. Ct. No. 19FE011863) |

On June 26, 2019, Rick S. (Rick) and Scott C. (Scott) burglarized Zachariah S.'s (Zachariah) home and stole a safe that contained money, guns, and drugs.  Some of the money and one of the guns stolen belonged to Zachariah's close friend, defendant Tyler Smith.  In revenge, defendant and Zachariah decided to recover their belongings from Rick and Scott and to rob them and split the loot.

Scott came to the house on the evening of June 26th with a gun.  During an altercation, defendant shot and killed Scott.  An investigation revealed that Scott's wallet and one of his two cell phones were missing.

LEGAL PROCEEDINGS

A jury convicted defendant of the first degree murder (Pen. Code, § 187, subd. (a)) of Scott (statutory section references that follow are to the Penal Code unless otherwise stated) and felon in possession of a firearm (§ 29800, subd. (a)(1)). The jury found true the special circumstance allegation that the killing was committed while defendant was engaged in the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)) and that defendant personally used a firearm "within the meaning of . . . sections 12022.5[, subdivision ](a) and 12022.53[, subdivision ](b))."

The trial court sentenced defendant to an indeterminate term of life without the possibility of parole for the murder and a consecutive determinate term of 12 years comprised of 10 years for the firearm enhancement and two years for being a felon in possession of a firearm. The court awarded 1,724 days of custody credits.

Defendant appeals.

He challenges his murder conviction on several grounds and contends insufficient evidence supports the robbery-murder special circumstance. Defendant also argues that the trial court erred by failing to instruct the jury on attempted robbery. Defendant further challenges several evidentiary rulings and says the alleged errors were cumulatively prejudicial.

Finally, defendant contends, and the People agree, that there are errors in the indeterminate abstract of judgment insofar as it incorrectly reflects that two section 12022.53, subdivision (b) personal use enhancements were found true. The parties also agree that the determinate abstract of judgment reflects the incorrect number of custody credits.

We find no merit in defendant's claim that the evidence was insufficient to convict him of the robbery-murder special circumstance. As for the alleged trial court errors, we agree that the trial court erroneously failed to instruct on attempt, but we find the error

2

harmless. We find no other errors and therefore reject defendant's claim of cumulative error.

However, we find this matter requires remand to the trial court with several instructions to the parties to resolve the discrepancies in the abstracts of judgment.

FACTS

The main events in this matter took place at a home on Sparrow Court in Carmichael. In June 2019, Zachariah lived at the Sparrow Court house, and Scott was in the process of moving in with him. Defendant was a close friend of Zachariah.

The Sparrow Court house was burglarized on June 26, 2019. The burglar or burglars stole a safe that contained money belonging to Zachariah and defendant, as well as drugs and two guns, one of which belonged to defendant. Two Cannondale bicycles also were stolen.

Defendant was intermittently dating Phoebe. G. and he was with her when Zachariah called to tell them that his home had been burglarized. Phoebe told defendant and Zachariah that Scott and Rick had talked about burglarizing the Sparrow Court house.

Zachariah was concerned that Rick and Scott would burglarize his home again while he was at work the following day, so he asked defendant if he would stay at the house while he was gone. Defendant also thought that Rick and Scott would return while Zachariah was at work and agreed to stay at the house. Defendant wanted to get the property back.

In discussing the burglary, Zachariah texted defendant: "You don't think I could get everything plus all their shit, too, which I'm still splitting with you guys of course." Defendant responded: "Your call. But give me 24 hours maybe. Working with feelings. Where [*sic*] they working with feelings when they violated your whole shit? Let me know, bubba." Defendant also commented, "They will get theirs."

3

Defendant arrived at the Sparrow Court house the following day and brought a loaded gun with him. Zachariah returned to the house later in the evening and went into his bedroom.

Defendant asked his friend, Megan M., to meet him at the house and to bring a new door lock and key for the front door so that Scott could not get into the home. Defendant also asked his friend Kim L. to inform him of Scott's whereabouts at all times without letting Scott know defendant was looking for him.

Kim went to the Sparrow Court house and arrived shortly after Megan in the evening. Kim closed the front door but did not lock it behind her. Defendant, Kim, and Megan were visiting in the kitchen area when Scott entered the house through the front door. Kim got up and looked down the hall to see that Scott had walked in; she said, "Oh my God, Ty, it is [Scott]." Defendant quickly got up, pulled his gun from his waistband, and went towards the front door where he saw Scott, who was also holding a gun. Scott said, "I got money for you" and defendant responded by demanding to know the location of the safe.

Defendant and Scott began yelling and fighting, with Scott saying, "ow, ow, ow"; he also asked defendant what he was doing and told him to stop. Defendant kicked and punched Scott and then hit him in the head with his gun several times; the gun went off during the fight. The entire incident lasted less than 15 seconds.

After she heard a gunshot, Megan walked from the kitchen to the entryway where she saw Scott bleeding on the ground near the front door and defendant standing nearby. Megan testified:

"Q     Okay. When you looked at the man on the ground, did he have anything?

"A     Yeah. There was a gun in front of his hand.

"Q     And that particular gun, do you remember if it was a revolver or a semiautomatic?

"A     I think a semiautomatic.

4

"Q     And you look and you see this gun.  What color was it?

"A     It was like forest green, I think, or some kind of green.

"Q     And at some point, you look away, correct?

"A     I think so.  I don't know.

"Q     When you looked back, was that gun then gone?

"A     Yeah."

Zachariah came out of his room after the gunshot and Kim left.

Defendant felt for a pulse on Scott and found none.  Zachariah and defendant carried Scott's body from the house and put it into the back of Scott's teal green Ford Explorer.  Zachariah then drove Scott's car towards the hospital with Megan following behind in her own car so that she could take Zachariah home afterwards.  Zachariah pulled the car up to the curb and parked it partly into a bike lane near the hospital; Megan drove Zachariah home.

Defendant was no longer at the Sparrow Court house when Zachariah and Megan returned.

A few hours after Zachariah left Scott's body in his car near the hospital, security officer Robert Chacon arrived for his shift at an imaging center near the hospital when he saw a teal green Ford Explorer that "didn't look right" parked partly in a bike lane across the street.  Chacon approached and heard the engine running with the keys inside but nobody in the front seat.  As he walked around, Chacon noticed a "trickle of blood" coming from the back of the car.

Scott's body was found in the back of his Ford Explorer.  He had been shot on the left side of his head.

Defendant came to Megan's house the next day to get some clothes.  Defendant told Megan he was going up north and said, "It is bad, leave, get a lawyer."

Although Scott customarily carried his wallet and two cell phones on his person, only one cell phone was found in his car during the investigation.

5

Defendant was arrested at a motel in Reno on July 11, 2019.  The murder weapon was never located.

## DISCUSSION

## I

### *Sufficient Evidence Supports Murder in the Commission of a Robbery*

Defendant contends the evidence presented at trial was insufficient to prove that he killed Scott during the commission of a robbery.  Specifically, defendant argues there was no evidence that property was taken from Scott by force or fear because his cell phone and wallet could have been stolen after he was killed.  Defendant also argues there is no evidence that he took any property from Scott or his immediate presence because Zachariah, Megan, and Kim were all in the house at the time and could have stolen Scott's wallet or cell phone.

Standard of Review

This court's role in reviewing a challenge to the sufficiency of evidence is limited.  (*People v. Smith* (2005) 37 Cal.4th 733, 738.)  When considering a claim of insufficient evidence, we examine the entire record to assess whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  Thus, "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]' [Citation.]  A reversal for insufficient evidence

6

'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid*.)

Additionally, "[w]hen undertaking such review, our opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*People v. Hill* (1998) 17 Cal. 4th 800, 849.)

Robbery

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "The taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165.) " ' "A thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." ' " (*People v. Hayes* (1990) 52 Cal.3d 577, 626-627.)

Sufficient evidence supports the jury's finding that defendant robbed Scott. Defendant and Zachariah planned to rob Rick and Scott after learning Rick and Scott had burglarized the Sparrow Court home. When discussing the burglary, Zachariah told defendant he intended to get "everything" that had been stolen "plus all their shit, too," which he planned to split with defendant. Defendant responded that it was Zachariah's "call" and told Zachariah to "let [him] know." Defendant also asked Kim to keep him informed of Scott's whereabouts. Defendant vowed that Scott and Rick would "get theirs."

Scott arrived at the Sparrow Court home with a gun in his hand. Defendant grabbed his own gun and approached Scott demanding to know the whereabouts of the

7

safe that held Zachariah and defendant's guns and money, as well as drugs. Defendant attacked Scott, kicking him and hitting him in the head with his gun for up to 15 seconds before the shooting. Scott could be heard yelling "ow, ow, ow." He also asked defendant what he was doing and told him to stop.

Megan testified that upon hearing a shot she walked from the kitchen to the entryway and saw Scott bleeding on the floor and defendant standing nearby. She testified she saw a green semi-automatic gun "in front of his hand." At some point she looked away and when she looked back the gun was gone. Neither Megan nor Zachariah were in the entryway.

A reasonable trier of fact could have found that defendant stole Scott's wallet and one of his cell phones immediately after defendant shot him which would have been consistent with defendant's and Zachariah's plan to get all of Rick's and Scott's "shit."

And a reasonable trier of fact also could have found that defendant stole Scott's gun immediately after the killing. After he was shot, Scott fell to the floor and, according to Megan, his green gun was on the ground near his hand. Defendant was standing nearby. According to Megan, she looked away from Scott and when she looked back the green gun was gone. There was no evidence that anyone other than Megan and defendant were in the entryway at that time.

Looking at this evidence in a light most favorable to the judgment, a reasonable trier of fact could have found that defendant took Scott's gun right after the shooting and his wallet and his cell phone. There would be no reason for defendant to leave Scott's gun, wallet or cell phone on or near Scott's body after he was killed.

We are not persuaded by defendant's argument that there is insufficient evidence of force or fear because defendant may have formed the intent to rob Scott after he died and could have taken the wallet and cell phone after the shooting. The jury could reasonably infer from the evidence that defendant intended to retrieve the stolen items from the safe and to steal Scott's property before Scott arrived at the house; that

8

defendant demanded the property from the safe when Scott arrived; that defendant used physical force and his gun to facilitate taking Scott's property before he killed Scott or immediately thereafter and that defendant took the wallet and cell phone that were never located but were customarily on Scott's person.

This is sufficient evidence to support the verdict even if the property had been taken after Scott died. Indeed, "[w]hile it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property." (*People v. Navarette* (2003) 30 Cal.4th 458, 499.)

Nor are we persuaded by defendant's argument that there was insufficient evidence that he took Scott's property from his immediate presence because Zachariah, Megan, and Kim were all in the house at the time Scott was shot and any of them could have stolen Scott's wallet or cell phone after he died. The failure to conclusively rule out other possible scenarios under which defendant might not be guilty of robbery does not render the evidence insufficient to support the robbery-murder special circumstance verdict. (*People v. Bolden* (2002) 29 Cal. 4th 515, 553.)

Because sufficient evidence demonstrates the jury could reasonably have found defendant completed the robbery, we need not address defendant's secondary claim of insufficient evidence of attempted robbery.

II

*An Instruction on Attempted Robbery*

Although defendant was charged with killing Scott in the commission or attempted commission of a robbery, the jury was not instructed on attempt. Defendant argues this failure was prejudicial error because the court did not instruct the jury with CALCRIM No. 460 and thus, "failed to convey the two elements of attempted robbery" that is, a

9

specific intent to commit robbery and a direct and ineffectual act done toward its commission within the meaning of section 21a.

The jury convicted defendant as alleged in Count One of the felony murder of Scott, the underlying felony being robbery.

Making use of CALCRIM No. 540A, as to that count the court instructed the jury as relevant here as follows:

"The defendant is charged in Count 1 with murder, under a theory of first degree felony murder.

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed or attempted to commit robbery;

"2. The defendant intended to commit robbery;

"AND

"3. While committing or attempting to commit robbery, the defendant personally committed an act that directly caused the death of another person."

CALCRIM No. 460, the instruction defendant argues should have been given to the jury, provides in relevant part:

"The defendant is charged in Count One with attempted robbery.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant took a direct but ineffective step toward committing robbery;

"AND

"2. The defendant intended to commit robbery."

In *People v. Cain* (1995) 10 Cal.4th 1, the defendant was charged with, among other things, attempted rape as a special circumstance to first degree murder. The defendant claimed the court committed prejudicial error by failing to inform the jury of the provisions of section 21a as explained in the then-existing jury instruction on the point, CALJIC No. 6.00.

10

While finding error, the court held that the omission of the attempt instruction did not contribute to the jury's verdict because the jury had made the requisite findings necessary for its verdict on the special circumstance. Referring to the predecessor instruction to CALCRIM No. 460 (CALJIC No. 6.00 (5th ed. 1988) the court explained:

" '[¶] An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' . . . [I]nsofar as relevant here this instruction merely restates the common meaning of 'attempt.' To attempt an act is to 'try' or 'endeavor to do or perform' the act. (Webster's New Internat. Dict. (2d ed. 1958) p. 177.) Defendant could not 'try' to rape [the victim] without intending to do so and doing an act toward the rape's commission. In finding defendant attempted or tried to rape [the victim], the jury thus necessarily considered and found to be true the elements set forth in [CALCRIM No. 460]. [N]o explanation other than rape or attempted rape was sufficient to explain the position of [the victim's] body and the presence of the pubic and body hairs in her clothes. Under these circumstances, we conclude omission of the attempt instruction did not contribute to the verdict obtained; the jury necessarily made the requisite findings necessary to hold defendant liable for this special circumstance. Our conclusion precludes finding prejudice, whether under the federal constitutional standard (*Chapman v. California* (1967) 386 U.S. 18, 24 []; *Yates v. Evatt* (1991) 500 U.S. 391 []) or that for state law error (*People v. Watson* (1956) 46 Cal.2d 818, 836 []). For the same reason, defendant's related claim of ineffective assistance of counsel in failing to request a definitional instruction is also unavailing." (*People v. Cain, supra,* 10 Cal.4th at p. 44.)

So too here. In finding defendant guilty of felony murder as charged in Count One which incorporates the Special Circumstance allegation that at the time of the murder the defendant "was engaged in, or was an accomplice in, the commission of *or* [*the*] *attempted commission of* the crime of robbery," the jury necessarily considered and found to be true that the defendant, in committing the murder, either committed robbery or

11

attempted, that is, tried to commit robbery. He could not have tried to commit robbery or taken a direct step to do so under these circumstances without harboring the requisite intent. Finally, we note that the jury was given the instruction on felony murder which also sets out the law relating to intent.

Given the evidence, no explanation other than robbery or attempted robbery would explain defendant's actions leading up to and occurring after the killing of Scott. The explanation of the law of attempt as set forth in CALCRIM No. 460 would have added nothing to the jury's understanding of the law applicable to this crime. And, as in *Cain, supra*, 10 Cal.4th at page 44, this precludes a finding of prejudice under federal or state law.

III

*Phoebe's Statement to Law Enforcement*

Defendant challenges the trial court's decision to admit Phoebe's statement to law enforcement officers that she believed defendant killed Scott because defendant went to the Sparrow Court home with two pairs of brass knuckles. According to defendant, the trial court abused its discretion by allowing the prosecutor to impeach Phoebe with this statement because it was irrelevant, constituted impermissible and speculative lay witness testimony under Evidence Code section 800, and any probative value of the statement was substantially outweighed by undue prejudice.

Defendant also claims the admission of Phoebe's testimony violated his federal due process right to a fair trial by lowering the prosecution's burden of proof.

Lastly, defendant contends that, to the extent his attorney failed to object to the admission of Phoebe's statement, he received ineffective assistance of counsel.

Phoebe was interviewed by law enforcement officers after the murder. The trial court held an Evidence Code section 402 hearing in anticipation of Phoebe's testimony at trial after which the court found she was a hostile witness. The trial court instructed the

12

parties that if Phoebe "testifie[d] to her lack of recollection on anything during direct but seems to remember more on cross-examination," the court would allow her to be impeached with her prior inconsistent statements made during her police interview even if those statements had been deemed inadmissible under Evidence Code section 352.

In anticipation of using Phoebe's prior statements, the parties reviewed the transcript of her police interview and discussed which portions would be admitted if necessary during her trial testimony. As relevant here, the parties discussed Phoebe's statement that she thought defendant "probably killed" Scott "[b]ecause it would make sense if like if [defendant] was in the house and he had two pairs of brass knuckles like he had hella shit on him." Defense counsel asked that the statement be omitted because it was not supported by any evidence and because it was prejudicial. The prosecutor countered that the statement should be admitted because it was inconsistent with Phoebe's testimony at the 402 hearing that she neither knew what happened to Scott nor did she have an opinion on it.

The statement was initially disallowed after the trial court found it to be "super prejudicial" and without a basis.

At trial, Phoebe denied knowing what "happened, who [wa]s involved or what went on" the night of the murder. In response to this denial, the prosecutor asked: "And, in fact, though you told the detectives when they were interviewing you about what happened, that you had formed the opinion that [defendant] probably killed [Scott]. You were asked why do you think that. And you said, 'Because it would make sense if like— if [defendant] was at the house and he had two pairs of brass knuckles,' correct?" Phoebe responded that she did not recall making that statement, and she denied knowing whether defendant had a weapon on him when he went to the house.

After Phoebe's testimony, the parties and court met to memorialize several side bar discussions relating to Phoebe's testimony. Of relevance here, the trial court changed its prior ruling on the admissibility of Phoebe's statement. Despite defense counsel's

13

arguments to the contrary, the trial court determined that Phoebe's statement was more probative than prejudicial. The court also found that Phoebe's prior statement was admissible as inconsistent with her testimony at trial wherein she denied knowing whether defendant went to the house with weapons.

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Relevant evidence is evidence that has a " ' "tendency in reason to prove or disprove any disputed fact that is of consequence" to resolving the case.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 358, quoting Evid. Code, § 210.)

Evidence Code section 352 authorizes a trial court to exclude relevant evidence that is unduly prejudicial. A trial court may exclude relevant evidence if the evidence's "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, subd. (b).) Prejudicial evidence under Evidence Code section 352 is " ' "evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 270.)

We review a trial court's decision to admit evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Thomas, supra*, 14 Cal.5th at p. 358.) The court's discretionary ruling under this statute " ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' " (*People v. Williams, supra,* 58 Cal.4th at pp. 270-271.)

The trial court did not abuse its discretion in admitting Phoebe's prior statement. Defendant told the jury that he went to the Sparrow Court house with a loaded gun and that he shot Scott. Phoebe's statement provided no additional material information for the jury's consideration that it did not already have. Phoebe thought defendant killed Scott and he admitted that he did. Even though Phoebe mentioned brass knuckles, and

14

none were used in the murder, this discrepancy does not result in undue prejudice to defendant.  In fact, Phoebe's statement that defendant went to the house with brass knuckles was less inflammatory than defendant's admission at trial that he went to the house with a loaded gun.  Thus, despite the statement having relatively low probative value, it was not prejudicial.  The trial court did not abuse its discretion.

Finding no abuse of discretion, we do not reach defendant's harmless error claim.

IV

*Ineffective Assistance of Counsel*

Defendant contends that although his attorney objected to the admission of Phoebe's statement "There could have been no reasonable tactic for any omission made by counsel regarding appellant's arguments on appeal.  Thus, deficient performance has been shown."

Defendant's ineffective assistance claim is forfeited for failure to support his argument with analysis and citation to evidence in the appellate record.  (Cal. Rules of Court, rule 8.204(a)(1)(B)(C); *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 [an argument is forfeited if it is raised in a perfunctory fashion without any supporting analysis and authority].)  Defendant neither identifies "any omission" made by counsel in the record nor does he explain how any such omission was deficient.  Indeed, the admissibility of Phoebe's statement was discussed at length by defense counsel both before and during trial.

V

*Megan's Statement About the Green Gun*

Defendant also challenges the trial court's decision to sustain an "asked and answered" objection by the prosecution that limited defense counsel's cross examination of Megan regarding the green gun she saw on the ground by Scott after he was killed.

Defendant contends that the focal point of his defense theory at trial was that Scott arrived at the Sparrow Court home with a gun and that he acted in self-defense when he killed Scott. Defendant concludes that Megan's testimony regarding Scott's gun was crucial to his defense and that the trial court abused its discretion by prohibiting counsel from eliciting testimony from her that she was "positive about her observation" of the green gun. Defendant further claims this error was prejudicial because if Megan had been able to confirm her observations, the outcome at trial would have been more favorable to him.

Additional Background

Defense counsel questioned Megan on cross-examination about the green gun she saw next to Scott's body after he was shot. The relevant exchange is as follows:

"Q So then when you walk around after she has left, you see [Scott] on the ground, correct?

"A Yeah.

"Q Okay. And you see a different gun on the ground next to where [Scott] is, correct?

"A Yes.

"Q And it is a green colored, like a dark Army forest green colored gun, correct?

"A Yes.

"Q That is different than the gun that you saw Mr. Smith with earlier, correct?

"A Yes.

"Q Different than the gun you saw him holding, correct?

"A Yes.

"Q     So you saw two guns that night -- well, actually three guns.  The revolver that you had that you never brought out, correct?

"A     Yes.

"Q     So Mr. Smith with the black gun, correct?

"A     Yes.

"Q     And a green gun on the ground next to where [Scott] was lying, correct?

"A     Yes.

"Q     And you are asked a lot of clarifying questions, but you are, as you sit here now, as you remember, you know you saw two guns, correct?

"A     Yes.

"Q     And it was not -- it couldn't have been the same gun?  There was no mistake in your mind that there was only one gun and it could have been the same gun, correct?

"MR. NG:     Objection.  Asked and answered.

"THE COURT:     Sustained."

Analysis

"The control of cross-examination is not only within the discretion of the trial court, but, in the exercise of that discretion, the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered or which are irrelevant."  (*People v. Beach* (1983) 147 Cal.App.3d 612, 628; see *People v. Ayala* (2000) 23 Cal.4th 225, 301 [" 'the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance' "].)

The question of whether Scott arrived at the Sparrow Court house with a gun was undoubtedly central to the self-defense theory at trial.  However, the fact that Scott was

17

armed when he arrived was covered extensively by defense counsel. Indeed, counsel asked Megan eight questions in a row about Scott's green gun during cross-examination. During the course of those questions, Megan confirmed, several times, that she saw three guns that night: a green gun near Scott's body, defendant's gun, and the gun she brought to the Sparrow Court house herself. Thus, by the time defense counsel asked her ninth question about the guns, whether there was any "mistake in [Megan's] mind that there was only one gun," the testimony on this point had been clearly and repeatedly established, putting aside the lack of clarity of the question. It was therefore appropriate for the trial court to sustain the "asked and answered" objection.

Finding no error, we do not reach defendant's prejudice argument.

## VI

### *Cumulative Error*

Defendant argues the trial court's errors in failing to instruct on attempt, admitting Phoebe's statement, and limiting Megan's testimony cumulatively prejudiced him and violated his due process rights. While it appears the trial court erred by failing to instruct with CALCRIM No. 460, the error was harmless. We find no prejudicial errors here to be cumulated.

## VII

### *Limited Remand*

#### Firearm Enhancements

The parties agree that the indeterminate abstract of judgment incorrectly reflects two section 12022.53, subdivision (b) personal use enhancements since the jury found only one to be true. The parties also agree the jury found true a section 12022.5, subdivision (a) personal use enhancement that is not included in the abstract. Defendant asks that we instruct the trial court to impose and stay a sentence under section 12022.5,

18

subdivision (a), and the People ask us to amend the abstract to include the section 12022.5, subdivision (a) enhancement since "both sections . . . applied for that 10-year enhancement."

We agree with the parties that the duplicate section 12022.53, subdivision (b) enhancement should be deleted from the indeterminate abstract of judgment because the record reflects that the jury found only one enhancement to be true under that code section. However, we decline the remaining requests related to the 12022.5, subdivision (a) enhancement.

The amended information does not allege a section 12022.5, subdivision (a) personal use enhancement. Instead, the charging document alleges as to count 1: "pursuant to subdivisions (b), (c) and (d) of . . . section 12022.53, and in the commission and attempted commission of the above offense(s), the defendant, TYLER SMITH, used, and intentionally and personally discharged a firearm, to wit, a handgun, and thereby proximately caused great bodily injury or death to SCOTT[], who was not an accomplice of the defendant, within the meaning of . . . section 12022.53[, subdivision ](d)."

Contrary to the allegations in the amended information, the verdict forms asked the jury to find whether defendant personally used a firearm "within the meaning of . . . section 12022.5[, subdivision (a) ]and 12022.53[, subdivision ](b)"; whether he used and personally and intentionally discharged a firearm under section 12022.53, subdivision (c); and whether he used and personally and intentionally discharged a firearm, and thereby proximately caused the death of Scott under section 12022.53, subdivision (d). The jury checked the box for "true" for the personal use enhancement but did not reach verdicts on the discharge enhancements. The allegations were dismissed.

The probation report indicates that the jury found both the section 12022.5, subdivision (a) and section 12022.53, subdivision (b) personal use enhancements to be true. It was recommended that the court impose the term for the enhancement with the longest term of imprisonment, which is 10 years for the section 12022.53, subdivision (b)

19

enhancement. The trial court said it was "inclined to follow the recommendation in the probation report," but did not mention the section 12022.5, subdivision (a) enhancement at the sentencing hearing. In fact, when it read the charges to defendant at the sentencing hearing, the trial court stated, "You're also charged with an enhancement under 12022.53, personal use of a firearm." No mention was made of the personal discharge allegations that were included in the amended information, nor did the trial court reference a section 12022.5, subdivision (a) personal use enhancement.

It is not clear to this court why the verdict form included a section 12022.5, subdivision (a) enhancement when one was never alleged in the charging document. It is likewise unclear why the jury was asked to consider section 12022.53, subdivision (b) and (c) enhancements when the amended information seems to only allege a subdivision (d) enhancement. We are also unable to ascertain from the record on appeal what, if any, legal significance there is to the mistrial on the subdivision (d) enhancement that was alleged in the amended information.

The trial court and the attorneys are in the best position to clarify the record regarding these discrepancies. As such, this matter is remanded with the following instructions:

(1) The clerk of the court is instructed to amend the indeterminate abstract of judgment to delete the duplicate section 12022.53, subdivision (b) personal use enhancement;

(2) The parties are instructed to clarify the record as it relates to the section 12022.5, subdivision (a) personal use enhancement that is included on the verdict form and in the probation report but is neither charged in the amended information nor included in the oral pronouncement of the sentence or indeterminate abstract of judgment; and

(3) The parties are further instructed to address the legal implication(s) of the mistrial and dismissal on the section 12022.53, subdivision (d) personal discharge enhancement that is alleged in the amended information.

Custody Credits

The parties also contend that the determinate abstract of judgment shows the incorrect number of custody credits. The trial court was informed by the clerk at the sentencing hearing that defendant had accrued 1,724 days of custody credits, and this is the number reflected on the abstract. However, the probation report shows that defendant had accrued a total of 1,744 days between the time he entered jail on July 12, 2019, and the time he was sentenced on April 19, 2024. The probation report correctly reflects the number of days defendant spent in custody between those dates. We agree with the parties that the determinate abstract of judgment should be amended to reflect the correct number of custody credits.

We therefore instruct the clerk of the trial court to amend the abstract of judgment to reflect the correct number of custody credits on remand.

## DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court for further proceedings in accordance with this opinion.

_____
HULL, Acting P. J.

We concur:

_____
BOULWARE EURIE, J.

_____
FEINBERG, J.

21